08-1783-cv (L), 08-2358-cv (XAP)
Mortimer Off Shore Servs., Ltd. v. The Fed. Republic of Germany

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT


August Term 2008

(Argued: May 13, 2009    Decided: July 26, 2010)

Docket Nos.  08-1783-cv (L), 08-2358-cv (XAP)

--------------------------------------------------------x

MORTIMER OFF SHORE SERVICES, LTD.,

Plaintiff-Appellant-Cross-Appellee,

-- v. --

THE FEDERAL REPUBLIC OF GERMANY,

Defendant-Appellee-Cross-Appellant.

--------------------------------------------------------x

B e f o r e :  WALKER, WESLEY, and WALLACE,[*] Circuit Judges.

Plaintiff-Appellant-Cross-Appellee Mortimer Off Shore Services, Ltd. appeals from the judgment of the United States District Court for the Southern District of New York (Lynch, Judge) dismissing Mortimer's action to enforce bearer bonds valued at $400,000,000 against Defendant-Appellee-Cross-Appellant the Federal Republic of Germany ("FRG") for failure to state a claim. Mortimer also appeals from the denial of its subsequent

---

[*] The Honorable J. Clifford Wallace, of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

motions to amend the judgment and for leave to file an amended complaint.  The FRG cross-appeals from the denial of its motion to dismiss for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq.

On appeal, we AFFIRM the district court's dismissal of Mortimer's action for failure to state a claim with regard to the Bonds issued in territory that became West Germany.  We agree with the district court that Mortimer cannot seek to enforce the West German Bonds without first complying with the statutory validation procedures aimed to ensure that the Bonds represent valid, legal obligations.  We further AFFIRM the motion to dismiss with regard to the Bonds issued in territory that became East Germany, however, we do so on alternative grounds.  We grant the FRG's motion to dismiss for lack of subject matter jurisdiction with respect to the East German Bonds because Mortimer failed to allege an "action [by East Germany or the FRG] . . . based upon a commercial activity."  28 U.S.C. § 1605(a)(2), that, if proven, would give rise to jurisdiction over a foreign sovereign.  Finally, we AFFIRM the district court's denial of Mortimer's motions to amend the judgment and for leave to file an amended complaint in regard to both the West German Bonds and the East German Bonds.

PEDER A. GARSKE (Mark A. Cymrot & Mark W. DeLaquil, <u>on the brief</u>), Baker & Hostetler LLP, Washington, DC,<u>for Plaintiff-Appellant-Cross-Appellee</u>.

JEFFREY HARRIS (Max Riederer von Paar & Walter E. Diercks, <u>on the brief</u>), Rubin, Winston, Diercks, Harris & Cooke, LLP, Washington, DC, <u>for Defendant-Appellee-Cross-Appellant</u>.

Tai-Heng Cheng, Associate Professor of Law & Associate Director, Center for International Law, New York Law School, New York, NY (Roger P. Alford, Professor of Law, Pepperdine University School of Law, Malibu, CA, <u>of counsel</u>), <u>for Amici Curiae Supporting Plaintiff-Appellant-Cross-Appellee</u>.

JOHN M. WALKER, JR., <u>Circuit Judge</u>:

Plaintiff-Appellant-Cross-Appellee Mortimer Off Shore Services, Ltd. ("Mortimer") appeals from the dismissal by the United States District Court for the Southern District of New York (Gerard E. Lynch, <u>Judge</u>) of Mortimer's action to enforce 351 bearer bonds ("Bonds") valued at over $400,000,000 (as of the filing of the complaint) against the Federal Republic of Germany ("FRG")[1] for failure to state a claim.  See <u>Mortimer v. The Fed.</u>

---

[1]  The Federal Republic of Germany has existed since 1949, but only included in its territory that of the former German Democratic Republic beginning in 1990, when the two countries unified.  Throughout our decision, "FRG" refers to the present-day Federal Republic of Germany, post-unification, "West Germany" refers to the Federal Republic of Germany prior to unification, and "East Germany" refers to the former German Democratic Republic.

_Republic of Germany_, No. 05 Civ. 10669 (GEL), 2007 WL 2822214 (S.D.N.Y. Sept. 27, 2007).  The complaint alleged that the FRG assumed liability for the Bonds, which were issued after the First World War by banks located in the state of Prussia in territory later comprising West Germany and East Germany.

We hold that Mortimer's claim seeking to enforce the Bonds issued in territory that became East Germany ("East German Bonds") must be dismissed for lack of subject matter jurisdiction, because Mortimer failed to allege an "action [by East Germany or the FRG] . . . based upon a commercial activity," 28 U.S.C. § 1605(a)(2), that, if proven, would give rise to jurisdiction over a foreign sovereign.  We further hold that Mortimer cannot seek to enforce the Bonds issued in territory that became West Germany ("West German Bonds") without first complying with the statutory validation procedures aimed to ensure that the Bonds represent valid, legal obligations.

Next, Mortimer appeals from the denial of its subsequent motions to amend the judgment and for leave to file an amended complaint.  We determine that leave to amend would be futile because the proposed amended complaint did not cure the original complaint's deficiencies, either by providing a basis for subject matter jurisdiction to enforce the East German Bonds, or by showing that the validation procedures do not apply to the West German Bonds.

Accordingly, we affirm the district court's dismissal of Mortimer's action in regard to both the West German Bonds and the East German Bonds, and we affirm its denial of Mortimer's motions to amend the judgment and for leave to file an amended complaint in regard to both the West German Bonds and the East German Bonds.

**BACKGROUND**

Mortimer possesses 351 bearer bonds entitled "German Provincial & Communal Bank Consolidated Agricultural Loan Secured Sinking Fund Gold Bonds Series A" ("Agricultural Bonds") that have a face amount of $25,000,000 and that, as of the commencement of this action in December 2005, were estimated to exceed $400,000,000 in value. Mortimer, 2007 WL 2822214, at *2. Mortimer brought this action to recover the outstanding principal and interest under the Bonds from the FRG.

On June 1, 1928, a consortium of fourteen provincial banks ("obligor banks") within the state of Prussia, a political subdivision of the German Reich, issued the Bonds and then loaned the proceeds to farmers as part of a Prussian program for improving agricultural conditions. Id. at *1. The state of Prussia allegedly guaranteed the obligor banks' obligations under the Bonds. The obligor banks were located within territory later constituting West Germany and East Germany, which have since been

reunified to make up the present-day FRG.[1]  The Bonds contained coupons from December 1944 and matured on June 1, 1958.  The thirty-year Bonds were "listed on the New York Stock Exchange," were marketed in the Southern District of New York, were made "payable . . . in the Borough of Manhattan," New York City, and "entitle[d] the holder to payment upon demand."  (Compl. ¶¶ 6, 8, & 13)  According to Mortimer, each obligor bank is severally liable for a value of the Bonds proportionate to its share of the underlying loans, and obligor banks located in West Germany and East Germany are liable for 35.5 and 64.5 % of the Bonds' debt, respectively.  Mortimer, 2007 WL 2822214, at *1.

---

[1] The FRG asserts on appeal that only nine of the issuer banks are located in its territory, and that the other five are located in present-day Poland and Russia.  However, the FRG cites no support for this proposition, which is contradicted by its own representations to the district court.  At the February 16, 2007 district court proceedings, Judge Lynch had the following exchange with Mortimer:

[MORTIMER'S COUNSEL]:  Well, it's a question of fact as to where the issuers were actually located and whether the law--

THE COURT:  But that's not in dispute.  We know who the 14 issuers were; there's no factual dispute about where those banks were located.  You can give me a map and point to where the boundaries of the former VRD [sic] and the former democratic republic were, and nobody is fighting about that, we don't need discovery, everybody knows where the banks were.

(Tr. 35:5-12.)  At no point during these proceedings did the FRG contend that some of the obligor banks were in Poland, Russia, or anywhere outside of former West German and East German territory.

6

## I. Historical and Legal Background

### A. German History

The FRG, as it "exists today[,] is the product of a long, contentious, and disparate history." Martin A. Rogoff, <u>The European Union, Germany, and the Länder: New Patterns of Political Relations in Europe</u>, 5 Colum. J. Eur. L. 415, 417 (1999). For many centuries, German territory, then part of the <u>Heiliges römisches Reich</u> (Holy Roman Empire or "First Reich"), consisted of "several hundred discrete political units." <u>Id.</u>

The modern German nation-state was formed in 1871, when most of these units were "united into one [centralized] state under the leadership of [the Kingdom of] Prussia," <u>id.</u>, a monarchy, and officially called the <u>Deutsches Reich</u> ("German Reich" or "Second Reich"). In 1919, after World War I ended, the King of Prussia abdicated his throne and the <u>Deutsches Reich</u> was declared the Weimar Republic.[2] The German Reich was made up of several states or <u>Länder</u>, the largest of which was the "Free state of Prussia," Michael Stolleis, <u>A History of Public Law in Germany, 1914-1945</u>, 108-09 (Thomas Dunlap trans., Oxford Univ. Press 2004), that encompassed territory later comprising both West Germany and East

---

[2] Mortimer's complaint alleged that the FRG succeeded to the debts of the "German Reich." (Compl. ¶ 11.) Because Mortimer seeks to enforce bonds issued in 1928, during which German territory was part of the Weimar Republic's <u>Deutsches Reich</u>, we interpret Mortimer's references to, and employ the term, "German Reich" to refer to the Weimar Republic.

Germany.

In 1933, as a result of growing discontentment with the Weimar government, the Nazi Party rose to power and Adolf Hitler was appointed Chancellor of Germany.  Over the next few years, the Drittes Reich ("Third Reich"), formally abolished the Länder parliaments, Rogoff, 5 Colum. J. Eur. L. at 418, and became a centralized totalitarian state.  In 1939, under Hitler's dictatorship, the Third Reich invaded Poland, and in 1941, attacked the Soviet Union and declared war on the United States, thereby beginning World War II in Europe.  See generally William L. Shirer, The Rise and Fall of the Third Reich:  A History of Nazi Germany (1960).

In 1949, four years after World War II ended, the western eleven Länder that were controlled by France, the United Kingdom, and the United States merged to form West Germany, a market economy, and the five Länder in the eastern sector occupied by the Soviet Union became East Germany, a communist Eastern block state that remained under the Soviet Union's political and military control.

On October 3, 1990, West and East Germany were reunified, thereby creating the present-day FRG.

**B.    Foreign Currency Bonds**

After the First World War, German enterprises sold a large number of bearer bonds which were underwritten, marketed, and

8

payable in the United States.  See Abrey v. Reusch, 153 F. Supp. 337, 339-42 (S.D.N.Y. 1957) (detailing the history of the validation laws and treaties relating to the bearer bonds); Dix v. Comm'r, 34 T.C. 837, 838-39 (1960) (same); J. L. Simpson, The Agreement on German External Debts, 6 Int'l & Comp. L.Q. 472, 472-86 (1957) (same).  Prior to World War II, the issuers repurchased many of these bonds for eventual retirement and submitted them to meet sinking fund and amortization requirements.  Abrey, 153 F. Supp. at 339.  After World War II began, it became "impossible to present such bonds to the American trustees or paying agents for cancellation."  Id.  As a result, German bank vaults held "large numbers" of reacquired, yet uncancelled foreign currency bonds, in negotiable form, that "no longer represented valid obligations."  Id.

After Germany surrendered in 1945, Russian occupation forces seized and returned to circulation many such bonds with an estimated total face value of $350,000,000, while bona fide purchasers possessed approximately $250,000,000 in valid bearer bonds.  Id.  The invalid, but uncancelled bearer bonds posed a significant problem, both domestically and internationally, as there was a

> real possibility that the eventual holders of the looted bonds would share the available assets . . . of the German obligors equally with the legitimate bondholders, a large number of whom were nationals of the United States.  Moreover, the free and open trading in the

9

United States of all German Dollar Bonds was impeded by the [resulting] uncertainties . . . .

Id. This problem of reacquired, yet uncancelled bonds is integral to the issues on appeal and several legislative acts and treaties that West Germany and the United States subsequently signed.

The parties have asserted that the following laws, agreements, and treaties bear on the question of whether the FRG has assumed liability for the Bonds Mortimer seeks to enforce: (1) the Validation Law[3] and accompanying 1953 Treaty,[4] (2) the London Debt Accord,[5] (3) the 1960 Treaty,[6] and (4) the Unification Treaty.[7] We briefly summarize the relevant portions of each of these documents.

---

[3] Gesetz zur Bereinigung von deutschen Schuldverschreibungen, die auf ausländische Währung lauten (Bereinigungsgesetz für deutsche Auslandsbonds—AuslWBG) [Validation Law for German Foreign Currency Bonds], Aug. 25, 1952, BGBl.I, at 553 (F.R.G.), translated in BGBl.II, at 305 (hereinafter Validation Law).

[4] Certain Matters Arising from the Validation of German Dollar Bonds, U.S.-F.R.G., Apr. 1, 1953, 4 U.S.T. 886, T.I.A.S. No. 2794 (entered into force Sept. 16, 1953) (hereinafter 1953 Treaty).

[5] Agreement on German External Debts, U.S.-F.R.G., Feb. 27, 1953, 4 U.S.T. 445 (hereinafter London Debt Accord).

[6] Second Agreement Regarding Certain Matters Arising from the Validation of German Dollar Bonds, U.S.-F.R.G., Aug. 16, 1960, 12 U.S.T. 944 (hereinafter 1960 Treaty).

[7] Vertrag zwischen der Bundesrepublik Deutschland und der Deutschen Demokratischen Republik über die Herstellung der Einheit Deutschlands (Einigungsvertrag) [The Treaty between the Federal Republic of Germany and the German Democratic Republic on the Establishment of German Unity (Unification Treaty)], Aug. 31, 1990, BGBl.II, at 889, translated in 30 I.L.M. 457 (hereinafter Unification Treaty).

1. Validation Law and 1953 Treaty

The 1953 Treaty and Validation Law were part of the overall process of quelling uncertainty about, and facilitating the "orderly settlement of," debts owed by territory that became West Germany after World War II, 1953 Treaty, 4 U.S.T. at 888. Specifically, the 1953 Treaty, to which West Germany, the United States, and various other Western Allied nations were signatories, incorporated by reference the 1952 Validation Law, see id., pursuant to which West Germany allegedly assumed liability for certain specified foreign currency bonds issued before the end of World War II, see Validation Law, BGBl.II, at 327, Schedule C.IV, and implemented a series of procedures to determine the validity of such bonds and to screen out invalid ones. The Agricultural Bonds, the category of bonds at issue in this case, are included in the schedule of foreign currency bonds covered by the Validation Law, see id. at 327, Schedule C.IV (19), and therefore subject to the Validation Law's procedures, see id. at 306, Arts. 1-2.

The Validation Law requires, inter alia, that the specified bonds held on January 1, 1945, outside West German borders as they existed in 1937, be registered, submitted along with relevant evidence, and validated after an administrative hearing by a Board for the Validation of German Bonds in the United States ("Validation Board") in Germany or the country of

11

offering.  See id., at 306, Art. 3; id. at 407, Art. 8; id. at 310-11, Art. 23.

### 2.  London Debt Accord

Negotiated contemporaneously in 1953, the London Debt Accord – signed by West Germany, the United States and several other nations, but not East Germany – aimed "to remove obstacles to normal economic relations" with other nations and to "facilitat[e] a resumption of payments on [its] external debts." London Debt Accord, 4 U.S.T. at 446.  The London Debt Accord represented the culmination of the parties' settlement negotiations respecting West Germany's pre-World War II external debts.  See Simpson, Agreement on German External Debts, 6 Int'l & Comp. L.Q. at 472-74.  West Germany agreed, in relevant part, to satisfy its "pecuniary obligations arising out of loan or credit contracts entered into before 8th May, 1945."  London Debt Accord, 4 U.S.T. at 448, Art. 4(1)(b).  In doing so, it did not repeal the validation requirements, stating that "[o]nly such creditors shall be entitled to benefit under [the Accord], as . . . accept the offer, or, in the case of other debts, assent to the establishment in accordance with such provisions of terms of payment and other conditions in respect of such debts."  Id. at 453, Art. 15(1).

The parties to the London Debt Accord anticipated the possibility of the reunification of West Germany and East Germany

by agreeing to "review the present Agreement" and to "mak[e] equitable adjustments" respecting East Germany's debts upon reunification.  Id., at 459, Art. 25.  However, they refrained from delineating what those adjustments would be.  As such, despite the discussion of East Germany's debts, the London Debt Accord did not obligate West Germany, after reunification, to compensate holders of bonds issued in what became East Germany after reunification.  See id.

### 3.   1960 Treaty

Seven years later, West Germany and the United States executed the 1960 Treaty, which amended the 1953 Treaty by extending the Validation Law to seven categories of bonds issued by utilities and mining corporations in territory that became East Germany.  See 1960 Treaty, 12 U.S.T. at 944-45.  The 1960 Treaty, however, did not extend the Validation Law to the Agricultural Bonds issued in the territory that became East Germany.

### 4.   Unification Treaty

On August 31, 1990, West Germany and East Germany signed the Unification Treaty reuniting the two nations into the present-day FRG.  Unification Treaty, BGBl.II, at 889.  Subject to certain limitations, West Germany's then-existing laws and legal obligations continued to be valid and were extended to the former East Germany:  West German federal law applied in former East

13

German territory "unless [a given law's] area of applicability [wa]s restricted to [West Germany] and unless otherwise provided in this Treaty, notably Annex I," id. at 469-70, Art. 8, as did "international treaties . . . to which [West Germany wa]s a contracting party," id. at 471, Art. 11.

Article 11 then provided exceptions for "the treaties named in Annex I." 30 I.L.M. at 471. Annex I, in turn, prohibited "the entry into force of federal law" of "the Securities Validation Act in the revised version published in Part III of the Federal Law Gazette under no. 4139-2, as most recently amended by Article 95(3) of the Law of December 14, 1976 (BGBl.1, p.3341)." Unification Treaty, App. I Ch. IV.A.I(9), translation available at http://www.juris.de (German Ministry of Justice, juris GmbH). Mortimer alleges that this language means that the Validation Law was not extended to cover the East German Bonds.

The Unification Treaty also provided that the FRG "shall take over the sureties, guarantees and warranties assumed by [East Germany] and debited to its state budget prior to unification." Unification Treaty, 30 I.L.M. at 479, Art. 23(6).

II. **Procedural Background**

A. **Original Complaint**

In December 2005, Mortimer commenced this action, claiming that the FRG "guaranteed, succeeded to, and/or assumed [liability for] the outstanding and unpaid principal and interest" under the

14

Bonds.  (Compl. ¶ 11.)

In June 2006, the FRG filed a motion to dismiss this action pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 et seq., and for failure to state a claim, respectively.  See Mortimer, 2007 WL 2822214, at *2, 6.  In response, Mortimer submitted declarations of support from two of its attorneys asserting first, that discovery was necessary to determine the scope and validity of the Validation Law, the validation procedures, and the Reunification Treaty, and second, that after unification, the validation procedures no longer apply.

On September 27, 2007, the district court denied the FRG's motion to dismiss for lack of subject matter jurisdiction. Mortimer, 2007 WL 2822214, at *6.  Analogizing the FRG's alleged assumption of "garden-variety" bond liability to routine, private commercial transactions, the district court held that the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2), applies, thereby conferring subject matter jurisdiction over this case. Mortimer, 2007 WL 2822214, at *4-6.[8]

---

[8]  The district court also found unavailing the FRG's contention that its alleged assumption of liability pursuant to an international treaty was not commercial and only constituted a "political act."  See Mortimer, 2007 WL 2822214, at *5-6.  We consider this argument abandoned, because the FRG did not reassert it on appeal. See Storey v. Cello Holdings, L.L.C., 347 F.3d 370, 380 n.6 (2d Cir. 2003) (holding that a party abandoned an argument by failing to raise it in its appellate brief).

15

The district court, however, granted the FRG's motion to dismiss on the basis that Mortimer's complaint failed to state a claim. Id. at *11. The district court noted that "unlike private parties, sovereigns can only assume liability for debt of predecessor states through explicit acts that leave traces in legal documents." Id. at *9 (emphasis in original). With respect to the West German Bonds, the district court determined that "the Validation Law is the only apparent source of [the FRG]'s liability," id. at *7, and that Mortimer could not "receive relief on its claim" because it had "not yet complied with the administrative process created by the Validation Law," id. at *11. As for the East German Bonds, the district court found that West Germany had not assumed liability under the London Debt Accord, and that, even assuming arguendo that West Germany had done so by way of the Validation Law and 1953 Treaty, Mortimer's "failure to comply with [the validation procedures] doom[ed] [its] claim." Id. at *10.[9] The district court concluded that Mortimer did not "affirmatively plead the source of [the FRG]'s obligation to satisfy the Bonds," id. at *8, and thus failed to "state a claim to relief that is plausible on its face," id. at *6 (quoting Bell Atl. Corp. v. Twombly, 550 U.S.

---

[9] The district court did not discuss whether East Germany assumed liability for the East German Bonds, although it impliedly rejected such a conclusion by requiring Mortimer to affirmatively plead the source of the FRG's alleged assumption of liability for the Bonds.

16

544, 570 (2007)).

**B. Proposed Amended Complaint**

On December 12, 2007, Mortimer filed motions pursuant to Federal Rule of Civil Procedure 59(e) to amend the judgment and for leave to file an amended complaint. With respect to the West German Bonds, the proposed amended complaint alleged that the London Debt Accord and 1953 Treaty do not require bondholders seeking to enforce their bonds against the FRG to comply with the validation procedures, and that, in any event, the Validation Law no longer applies after unification. As for the East German Bonds, the proposed amended complaint listed various "acts of recognition" by which Mortimer alleged that the FRG "repeatedly recognized its obligation for the pre-war external debt of the German Reich and the [s]tate of Prussia." (Proposed Am. Compl. ¶ 15.) The proposed amended complaint also averred that the Unification Treaty exempts the East German Bonds from the validation procedures.

On April 9, 2007, the district court denied Mortimer's motion as "essentially an effort to reargue the basic rationale" underlying the dismissal of the claim. Mortimer, No. 05 Civ. 10669, Order at 1. The district court reasoned that Mortimer's added allegations that the FRG adopted the obligations of former East Germany by taking over its territory and by entering into the Unification Treaty of 1990 "d[id] not explain how the former

17

East German state assumed any liability on the [B]onds, or how the provisions of the Validation Law [were] overcome." Id. The district court also concluded that "the relation of the present Federal Republic to the pre-war governments of Germany is a classic example of state succession" and not simply a change of government. Id. at 2.

Mortimer appealed, challenging both the dismissal of its complaint for failure to state a claim, and the denial of its motions to amend the judgment and for leave to file an amended complaint. The FRG cross-appealed, challenging the district court's holding that it had subject matter jurisdiction over Mortimer's claim under the FSIA.[10]

**DISCUSSION**

**I.   Subject Matter Jurisdiction Pursuant to the FSIA**

The FSIA, which "is the sole source for subject matter jurisdiction over any action against a foreign state," Cabiri v. Republic of Ghana, 165 F.3d 193, 196 (2d Cir. 1999), provides that a foreign sovereign "shall be immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless one of the FSIA's exceptions applies, 28 U.S.C. §§ 1605-07. In deciding subject matter jurisdiction pursuant to the FSIA, we

_____

[10]   Tai-Heng Cheng, Associate Professor of Law at New York Law School, and Roger P. Alford, Professor of Law at Pepperdine University School of Law, filed an amici curiae brief in support of Mortimer.

18

review district court factual findings for clear error and legal conclusions de novo. Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 80 (2d Cir. 2002).

The burden is on the defendant seeking sovereign immunity to show it is a foreign sovereign. Matar v. Dichter, 563 F.3d 9, 12 (2d Cir. 2009). If the defendant makes this showing, the burden then shifts to the plaintiff to show that a FSIA-enumerated exception to sovereign immunity applies. Id. Under the FSIA, in the context of a Rule 12(b)(1) motion based on factual insufficiency, a court may look beyond the pleadings, to the evidence properly before it, and assess the substance of the allegations "to determine whether one of the exceptions to the FSIA's general exclusion of jurisdiction over foreign sovereigns applies." Id. at 140 & n.6 (citations omitted). The district court should make this determination recognizing that "a motion to dismiss based on an assertion of sovereign immunity has particular significance because . . . [s]overeign immunity under the FSIA is immunity from suit, not just from liability." Robinson, 269 F.3d at 141 (internal quotation omitted).

The question we must answer in this case is whether the commercial activity exception to foreign sovereign immunity

19

provided by section 1605(a)(2) of the FSIA applies. Section 1605(a)(2) states, in relevant part, that a foreign state is not immune where

> the action is based [i] upon a commercial activity carried on in the United States by the foreign state; or [ii] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [iii] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Mortimer relies upon the third clause of section 1605(a)(2) to establish jurisdiction; thus, we need consider only "whether this lawsuit is (1) 'based . . . upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992) (quoting 28 U.S.C. § 1605(a)(2). The parties agree that the alleged acts at issue took place outside of the United States and caused direct effects in the United States. Mortimer, 2007 WL 2822214, at *3. Accordingly, our concern is whether, upon the complaint, an alleged act occurred and, if so, whether it occurred "in connection with a commercial activity of the foreign state." 28

20

U.S.C. § 1605(a)(2). If either of these did not occur then the foreign state enjoys sovereign immunity under the FSIA and the claim against the state must be dismissed for lack of subject matter jurisdiction.

We begin our analysis by "identifying the particular conduct on which [Mortimer's] action is 'based' for purposes of the Act." Saudi Arabia v. Nelson, 507 U.S. 349, 356-57 (1993) (internal citation omitted). The act is defined by the "elements of a claim that, if proven, would entitle [Mortimer] to relief under [its] theory of the case." Id. The alleged conduct that forms the basis of Mortimer's action is the assumption of liability by the FRG, and earlier by West Germany and East Germany, for the Bonds issued by banks in the territory that became West Germany and East Germany.

The next step in our analysis is to determine (a) whether the foreign state (in this case, the FRG, West Germany, or East Germany) actually assumed liability for the Bonds, (b) whether the state committed an action in doing so, and (c) whether the assumption of liability was an action "in connection with a commercial activity" of the state that assumed liability. Mortimer seeks to recover bonds issued by banks in the territory

21

that became both West Germany and East Germany, and we address each in turn.

### A.    The West German Bonds

Mortimer's original complaint contended that West Germany, and subsequently the FRG, assumed liability for the Bonds, 35.5% of which were issued in what later became West Germany.  It alleged that West Germany obligated itself to honor the terms of these bonds by enacting the Validation Law, see Validation Law, BGBl.II at 306, Arts. 1-3; id. at 327, Schedule C.IV, and by adopting the 1953 Treaty; it further alleged that upon reunification the FRG agreed to honor West Germany's laws and treaties, resulting in the FRG's assumption of West Germany's obligation for its share of the Bonds.  See Unification Treaty, 30 I.L.M. at 471, Art. 11.  The FRG disagrees, contending that it did not assume liability for any bonds that were issued in what later became West Germany and that, pursuant to the London Debt Accord, its responsibility in relation to properly validated West German Bonds was only that of a "transfer agent."  We need not determine the FRG's obligations respecting properly validated West German Bonds to resolve this appeal because the FRG waived its "transfer agent" argument by failing to present it to the

22

district court.  See Paese v. Hartford Life & Accidents Inc. Co., 449 F.3d 435, 446 (2d Cir. 2006) (failure to raise an argument below generally bars appellate consideration of it); Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 104 (2d Cir. 2001).

Before the district court, the FRG neither contended that it was not liable for properly validated West German Bonds, nor contested Mortimer's allegations that the FRG assumed liability for payment of the relevant bond obligations under the Validation Law and the 1953 Treaty.  In its motion to dismiss for lack of subject matter jurisdiction, the FRG agreed that it had assumed liability for properly validated West German Bonds but asserted that this assumption of liability was sovereign in character and therefore entitled to immunity pursuant to the FSIA.  Likewise, in its motion to dismiss for failure to state a claim, the FRG did not dispute Mortimer's allegation that the FRG had assumed liability for properly validated West German Bonds.  The FRG argued instead that Mortimer had not, and could not, state a claim because Mortimer had failed to comply with the requirements of the Validation Law.

Because the FRG presented no argument to the district court disputing its liability for properly validated West German Bonds, the district court's order simply set forth a then-undisputed proposition: "West Germany assumed liability for certain bonds issued prior to the end of World War II, and by operation of the [1953] Treaty, its liability was extended to bonds offered in the United States." Mortimer, 2007 WL 2822214, at *1. The statement was a summary of facts assumed as true by both parties. As a consequence of the FRG's failure to dispute its assumption of liability over properly validated West German Bonds to the district court, it may not raise that argument on appeal.

Starting from the premise that West Germany and the FRG assumed liability for properly validated West German Bonds, we conclude that this affirmative assumption of liability plainly constitutes an action under section 1605(a)(2) of the FSIA. The FSIA defines commercial activity as "a regular course of commercial conduct or a particular commercial transaction or act" whose "character . . . shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). In Weltover, the Supreme Court held that Argentina's issuance of

24

"garden-variety" bonds as an "emergency measure[]" to refinance the country's debt constituted commercial activity for FSIA purposes. 504 U.S. at 609, 615. The Supreme Court clarified that the "nature" and not the "purpose" of a transaction "control[s] in determining commerciality" under section 1605(a)(2). Id. at 615. Applying this principle, the Weltover Court determined that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." Id. at 614 (emphasis omitted).

Private parties can and often do assume liability for bonds in trade or commerce. This would occur, for example, when, after issuing bonds, Company A is acquired by and merged into Company B, which then assumes liability for Company A's bonds. By allegedly assuming obligations under the Bonds, the FRG, like Argentina in Weltover, engaged in activity routinely undertaken by private parties. There is "nothing distinctive about [the FRG]'s assumption of debt (other than perhaps its purpose) that would cause it . . . to be classified" as non-commercial activity. Id. at 615; see also Jackson v. People's Republic of China, 550 F. Supp. 869, 873 (D. Ala. 1982) (applying the

25

commercial activity exception to bonds issued by China on the basis that "[i]t is clear that the sale, issuance of sale and authorization of issuance for sale in the United States constitutes a 'commercial activity'"); cf. In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d 71, 92 (2d Cir. 2008) (finding no commercial activity where defendants allegedly made "donations to charity" that were not "part of the trade and commerce engaged in by a merchant in the marketplace" (internal quotation marks omitted)).  The commercial nature of the act of assuming the West German Bonds "is confirmed by the fact that [the Bonds] are in almost all respects garden-variety debt instruments:  They may be held by private parties; they are negotiable and may be traded on the international market . . . ; and they promise a future stream of cash income."  Weltover, 504 U.S. at 615.

The FRG does not challenge the conclusion that assumption of liability of the Agricultural Bonds would be an act in connection with a commercial activity under the FSIA; rather, it argues, as it did below, that even if it has assumed liability for properly validated West German Bonds, the commercial activity exception would not apply to Mortimer's West German Bonds because Mortimer

26

failed to satisfy the settlement conditions set forth in the London Debt Agreement by not complying with the validation procedures. We are unpersuaded that non-compliance with the validation procedures undermines the applicability of the commercial activity exception to the FSIA. The issue of whether Mortimer complied with the validation procedures does not touch upon any of the requirements of the commercial activity exception, which is concerned with the conduct of the foreign state and not the allegedly aggrieved party. Mortimer's alleged lack of compliance does not implicate whether the challenged conduct occurred outside of the United States, was based upon an act in connection with the commercial activity of the foreign state, or caused a direct effect in the United States. 28 U.S.C. § 1605(a)(2). Taking up the validation issue at the jurisdictional stage would thus be premature. See Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."); Robinson, 269 F.3d at 141 ("'[J]urisdiction is not defeated by the possibility that the

averments might fail to state a cause of action.'" (quoting Bell v. Hood, 327 U.S. 678, 682 (1946))).

Finally, even if we were to accept the FRG's contention that it did not assume liability and merely acted as a transfer agent, this court would still have jurisdiction over Mortimer's action pursuant to the FSIA's commercial activity exception. In Transamerican Steamship Corp. v. Somali Democratic Republic, 767 F.2d 998, 1002-03 (D.C. Cir. 1985), the only case upon which the FRG relies for its transfer agent theory, the D.C. Circuit rejected a similar argument and found that the Somali embassy "exceeded the bounds of ordinary diplomatic behavior" by "collecting and holding funds and advising a principal as to their receipt." As the D.C. Circuit stated, "[t]he proper inquiry is whether [the state] acted in a sovereign or essentially private capacity." Id. at 1002. Because private parties frequently take on similar "transfer agent" obligations, this court would have jurisdiction even if the court were to accept the FRG's argument that it merely acted as a transfer agent.

Accordingly, we agree with the district court that the FSIA's commercial activity exception applies to the West German

Bonds and affirm the district court's denial of the FRG's motion to dismiss Mortimer's claims on the West German Bonds for lack of subject matter jurisdiction.

**B.   The East German Bonds**

Turning to the East German Bonds, our jurisdictional determination is different.  Looking to the allegations in the complaint and the proposed amended complaint, as well as the evidence properly before us, we hold that Mortimer failed to meet its jurisdictional burden with respect to enforcing the East German Bonds against the FRG.

Mortimer seeks to enforce the 64.5% of the Bonds issued by Prussian banks located in territory that became East Germany. Mortimer argues that jurisdiction is appropriate under two theories.  Its first theory, predicated on successor state liability, alleges that liability exists on the basis of the FRG's formal takeover of "the territory covering the East German provincial and communal debt . . . represented by the Bonds." (Proposed Am. Compl. ¶ 15.)  Its second theory, predicated on affirmative assumption of liability, alleges that the FRG "entered into an agreement . . . in which it assumed liability for the pre-war external debt of the German Reich," and

29

"acknowledg[ed] and confirm[ed] [its] payment obligations under the Bonds" (Compl. ¶¶ 11, 20); however, the complaint neither specified nor provided copies of treaties or other legislative documents as sources of that alleged liability. In contrast, Mortimer's proposed amended complaint identified various "acts of recognition" by which the FRG allegedly "recognized its obligation for the pre-war external debt of the German Reich[,] the [s]tate of Prussia," and East Germany, but it proffered no evidence of an explicit assumption of liability. (Proposed Am. Compl. ¶ 15.)

We hold that automatic assumption of liability by a successor state, even if established, would not meet the requirements of the FSIA's commercial activity exception. We further find that there is no evidence presented that East Germany and the FRG explicitly assumed liability for any East German Agricultural Bonds, unlike West Germany, which affirmatively and unequivocally assumed liability for valid West German Agricultural Bonds by enacting the Validation Law and subsequent treaties, see, e.g., Validation Law, BGBl.II, at 327, Schedule C.IV(19). Accordingly, we find that subject matter

jurisdiction is lacking over Mortimer's cause of action against East Germany.

### 1.   Successor State Assumption of Liability

State succession occurs when one State is replaced by another in its "responsibility for the international relations of territory."  Paul Williams & Jennifer Harris, State Succession to Debts and Assets: The Modern Law and Policy, 42 Harv. Int'l L.J. 355, 362 & n.21 (2001) (internal quotation marks and citations omitted).  The Third Restatement of Foreign Relations Law provides that "where part of the territory of a state becomes territory of another state, local public debt [is] transferred to the successor state; [and] where a state is absorbed by another state, the public debt . . . pass[es] to the absorbing state."  Restatement (Third) of Foreign Relations Law § 209(2)(a)-(b) (1987).

Mortimer alleges that East Germany and the FRG automatically acceded to liability for the East German Bonds as successor states of Prussia and that this assumption of liability constitutes an "action . . . based upon a commercial activity" 28 U.S.C. § 1605(a)(2).  While we have our misgivings as to whether successor state liability is even applicable in this

31

case,[11] we need not reach that question.  Even if we were to find successor state liability, Mortimer's cause of action would

___

[11]    See 767 Third Ave. Assocs. v. Consulate Gen. of Socialist Federation of Yugoslavia, 218 F.3d 152, 161 (2d Cir. 2000) (stating that "[t]here is no [absolute] rule of law that automatically subrogates successor states to their predecessor's debt"); Restatement (Third) of Foreign Relations Law, at IX (stating that the Restatement is "in no sense an official document of the United States," because "a number of particulars . . . in [it] are at variance with positions that have been taken by the United States Government." (internal quotation marks omitted)). Successor state liability for the debts of the predecessor state is a far from settled issue of law.  See Tai-Heng Cheng, Renegotiating the Odious Debt Doctrine, 70 Law & Contemp. Probs., Summer 2007, at 7, 11 (stating that "[t]here are no clear customary rules or multilateral treaties in force governing whether and when a successor state is responsible for the debts of its predecessor state" and that "[j]urists are divided on what the applicable rules might be," despite urging this court in his amici curiae brief to find in favor of Mortimer); see generally Williams & Harris, supra; Jeff A. King, Odious Debt:  The Terms of the Debate, 32 N.C. J. Int'l L. & Com. Reg. 605, 609 & n.9 (2007) (providing numerous, conflicting sources).  In 767 Third Avenue, we underscored the policy and institutional dangers of finding successor state liability, namely, that "[s]uch an outcome would directly 'interfere with executive foreign policy prerogatives.'"  218 F.3d at 160 (quoting Can v. United States, 14 F.3d 160, 163 (2d Cir. 1994)).

For example, reinforcing our concerns regarding interference with executive foreign policy prerogatives, the FRG has disavowed any liability for the East German Bonds throughout this litigation, and the FRG's Federal Court of Justice, its highest court for civil and criminal matters, recently denied the claim of a United States holder of German dollar bonds issued in 1925 in a city located in what later became East Germany, concluding that neither East Germany nor the FRG succeeded to such debt automatically, under international law, or by way of an affirmative legislative act and treaty.  See Bundesgerichtshof [BGH] [Federal Court of Justice] Oct. 25, 2005, 25 Entscheidungen des Bundesgerichtshofes in Zivilsachen [BGHZ] 353/04 (F.R.G.); cf. James V. Feinerman, Odious Debt, Old and New:  The Legal Intellectual History of an Idea, 70 Law & Contemp. Probs., Fall 2007, at 193, 197 n.17 ("Successor regimes that have renounced the debts of their predecessors include . . . East Germany.").

32

nevertheless not lie because it would fail to allege an "action . . . based upon a commercial activity." § 1605(a)(2). Accession to liability by the rules of customary international law entails no action by the successor state with respect to the commercial activity at issue – the assumption of liability. The state performs no action when it automatically assumes liability. This stands in sharp contrast to a country's assumption of liability through an explicit act, such as West Germany did here. E.g., Weltover, 504 U.S. at 609, 615 (holding that Argentina's issuance of bonds was an action that satisfied the FSIA's commercial activity exception). Because no "action" within the meaning of § 1605(a)(2) occurs when a successor state accedes to liability, the requirements of FSIA's commercial activity exception are not met in that context and jurisdiction under the FSIA based on such an accession will not lie.

2.    Affirmative Assumption of Liability

Mortimer also alleges that the FRG acceded to obligations under the East German Bonds through various legislative documents and treaties referenced in the original and proposed amended complaints as "acts of recognition." If these documents were sufficient to establish that the FRG became obligated under the

33

East German Bonds, then FSIA jurisdiction would be present; however, they are insufficient, and jurisdiction is absent here as well.

The complaint alleged that "[a]fter World War II, Germany entered into an agreement with the Allied High Commission in which it assumed liability for the pre-war external debt of the German Reich." (Compl. ¶ 11.) However, the complaint provided no further specifics respecting this "agreement." Thus, we understand the complaint's reference to "an agreement with the Allied High Commission" to refer to the London Debt Accord, which is the only possible, reasonable interpretation of Mortimer's complaint.[12]

In addition, Mortimer's proposed amended complaint specified "acts of recognition" by which the FRG allegedly "repeatedly recognized its obligation for the pre-war external debt of the

---

[12] The district court similarly interpreted the complaint as "vaguely allud[ing] to . . . the London Debt Accord," see Mortimer, 2007 WL 2822214, at *10, and Mortimer has not contended on appeal that the complaint referred to a different agreement. Nor could we interpret Mortimer's complaint as referring to the Validation Law, the 1953 Treaty, or the 1960 Treaty. With respect to the Validation Law and 1953 Treaty, neither document expressly provided for foreign currency bonds issued in the territory of East Germany and East Germany was not a signatory to the treaty. See 1953 Treaty, 4 U.S.T. at 887-91; Validation Law, BGBl.II at 305-27. As for the 1960 Treaty, although it extended the 1953 Treaty to some East German bonds, it did not do so for the Agricultural Bonds, and thus the East German Bonds at issue here. See 1960 Treaty, 12 U.S.T. at 944-45.

German Reich and the [s]tate of Prussia": (1) the Unification Treaty, 3 I.L.M. at 379, Art. 23(6); (2) a letter dated March 6, 1951 from Konrad Adenauer, Chancellor, Federal Republic of Germany, to André François-Poncet, Chairman, Allied High Commission (Mar. 6, 1951), reprinted in 2 U.S.T. 1250, 1250, translated in 2 U.S.T. 1252, 1252 (hereinafter Adenauer Letter); and (3) a post-reunification Letter on Behalf of the Federal Republic of Germany to Office of the Chief Counsel, Securities and Exchange Commission (Feb. 18, 1994) (hereinafter SEC Filing).[13]

We examine each of these documents in turn to determine whether any of them constitutes an act conferring liability for the East German Bonds upon the FRG.

### a. London Debt Accord

The FRG's Federal Court of Justice concluded in 2005 that the London Debt Accord does not govern foreign currency bonds issued in territory that became East Germany, and that applying

---

[13] The fourth "act of recognition" Mortimer identified is [the FRG]'s formal takeover of "the territory covering the East German provincial and communal debt . . . represented by the Bonds." (Proposed Am. Compl. ¶ 15.) This argument is predicated upon a theory of successor state liability. Because we do not find such a theory cognizable under the FSIA's commercial activity exception, see supra, we reject this fourth "act of recognition."

35

the Accord to such bonds would exceed the appropriate boundaries of judicial decision-making.  See Bundesgerichtshof, 25 BGHZ 353/04, at 19 ¶ 41.  We agree.

Only two provisions of the London Debt Accord, adopted in 1960 by West Germany, address West Germany's liability for the debts of either the German Reich or East Germany.  Neither obligates West Germany to assume liability for the East German Bonds.

The first, Article 20, governs "Reich [d]ebts" and provides that West Germany will, "at the request of the interested creditors, enter into direct negotiations with regard to these debts."  London Debt Accord, 4 U.S.T. at 457.  This provision plainly applies only to debts of the German Reich "owing under [m]ultilateral [a]greements," meaning debts for which either the German Reich or West Germany had already assumed liability.  Id. Even assuming arguendo that the East German Bonds constitute "Reich [d]ebts" for purposes of the London Debt Accord,[14] as Mortimer has maintained throughout this action, the Validation Law and 1953 Treaty, cover only foreign currency bonds issued in what later became West German territory.  (See Tr. 30:16-19

---

[14] This requires significant speculation given that Mortimer alleges only that the State of Prussia, one of the German Reich's Länder, guaranteed twelve of the fourteen obligor banks. **JA. 39.**

36

(Mortimer's counsel stated that "the validation law . . . . made every effort not to cover East Germany liabilities [sic] at the time. That's confirmed."); Tr. 36:18-21 (arguing that the 1953 Treaty references and is governed by the Validation Law). Thus, Article 20 does not indicate that the Accord confers East German Bond liability upon West Germany.

The second provision, Article 25, specifically refers to bonds issued in territory that became East Germany, providing that "the Parties . . . will review the [Accord] on the reunification of Germany" to "mak[e] the [Accord's] provisions . . . applicable to the debts of persons residing in" East Germany. 4 U.S.T. at 459. Although anticipating West and East Germany's reunification and the need to "mak[e] equitable adjustments," respecting debts incurred in the territory of East Germany, id., Article 25 and the remainder of the Accord refrained from delineating those possible adjustments, let alone imposing liability upon West Germany for any of East Germany's debts. Thus, we conclude that the London Debt Accord did not obligate the FRG to compensate holders of bonds issued in what became East Germany.

### b. Unification Treaty

Mortimer's proposed amended complaint also alleged that upon unification, the FRG assumed liability for East Germany's debts, including the East German Bonds. Article 23 of the Unification Treaty provides that the FRG "shall take over the sureties, guarantees and warranties assumed by [East Germany] and debited to its state budget prior to unification." Unification Treaty, 30 I.L.M. at 479, Art. 23(6). Article 23 is "based on the recognition that [the FRG] is liable for [East Germany's] state debts." Frowein, 86 Am. J. Int'l L. at 157. But, Mortimer's argument suffers from a critical flaw: the failure to allege how East Germany assumed liability for bonds issued by private banks located in the state of Prussia. As we concluded in our discussion of automatic successor liability, supra, Mortimer has failed to allege an affirmative act by which East Germany assumed liability for debt issued within the German Reich, let alone the state of Prussia. Thus, Mortimer's allegation that the Unification Treaty alone provides no basis for liability beyond speculation that East Germany assumed liability for the bonds. A claim based on such speculation is implausible. See Iqbal, 129 S. Ct. at 1949.

38

### c. Adenauer Letter and the FRG's SEC Filing

The remaining documents referenced in Mortimer's amended complaint are West German Chancellor Konrad Adenauer's letter to the Allied Commission in 1951 opining that West Germany is "liable for the pre-war external debt of the German Reich," 2 U.S.T. at 1252, and, the FRG's SEC filing in 1994 stating that the FRG "is not only the successor to, but is identical with, the German Reich under principles of international public law," and that "holders of the interest coupons or talons . . . can look only to the Federal Republic for payment," SEC Filing at 3.

Neither document provides an independent legal basis for holding the FRG liable for the East German Bonds. Mortimer has identified, and we have located, no precedent holding a foreign sovereign state liable based solely on a representation by its head of state or an administrative filing made in the United States on the sovereign's behalf. Moreover, neither document expressly mentions the East German Bonds at issue; instead, each discusses West Germany's affirmative assumption of liability for the German Reich's pre-war external debts issued in what became West Germany. It is at best ambiguous whether such statements were intended to cover the East German Bonds, thereby expanding

39

the FRG's legal obligations, as opposed to discussing then-existing debts and obligations undertaken by West Germany in pre-existing multilateral agreements such as the 1960 Treaty.

Chancellor Adenauer's 1951 letter speaks only to West Germany's assumption of the German Reich's debt; it gives no indication that West Germany assumed more than the debt incurred in what became its territory or otherwise obligated itself to honor debt incurred in what became East Germany. Instead, the letter discusses West Germany's debts by reference to its obligation to "resume payments on the German external debt." 2 U.S.T. at 1253. Moreover, Mortimer has never explained how West Germany might have assumed liability for the East German Bonds or would have had any motivation to do so prior to the 1951 letter, such as by way of a preexisting multilateral agreement.

The SEC filing cited by Mortimer provides that the FRG is liable for "certain bonds issued between 1924 and 1930 by the German Reich and the [s]tate of Prussia," and subsequently references "interest payments" that the present-day FRG "obligated itself to pay . . . following the reunification of Germany" under the London Debt Accord. SEC Filing at 1 (emphases added). As already explained, because the London Debt Accord

40

does not cover foreign currency bonds issued in the territory of East Germany, the SEC filing logically refers only to bonds issued in what became West German territory, bonds for which West Germany and thus the FRG repeatedly and affirmatively assumed liability, beginning with the Validation Law and 1953 Treaty. Accordingly, we conclude that neither letter expands the FRG's liability to encompass obligations for the East German Bonds.

After considering and rejecting all the documents identified by Mortimer's proposed amended complaint as potential bases for holding the present-day FRG liable for the East German Bonds as incapable of advancing Mortimer's claim for compensation, we are left with "mere conclusory statements," Iqbal, 129 S. Ct. at 1949, in Mortimer's original complaint. These contentions fail to show anything "more than a sheer possibility," id., that the FRG assumed liability under the East German Bonds. We thus agree with the district court that leave to amend would be futile because Mortimer's proposed amended complaint did not cure the original complaint's deficiencies. See Acito, 47 F.3d at 55.

For the foregoing reasons, we affirm the judgment of the district court dismissing Mortimer's claim to enforce the East German Bonds, but we do so on the alternative ground that

41

Mortimer has failed to make the threshold showing necessary to invoke the commercial activity exception to the FSIA, and therefore subject matter jurisdiction is lacking.  Insofar as Mortimer has moved for leave to amend the judgment and to amend the complaint with respect to the East German Bonds, we affirm the district court's denial of that motion.

**II.  Mortimer's Claim to Recover on the West German Bonds**

Having found subject matter jurisdiction present with regard to the West German Bonds, we now consider Mortimer's claim as to those Bonds on the merits.  We review the district court's order granting the FRG's motion to dismiss under Rule 12(b)(6) de novo, "consider[ing] the legal sufficiency of [Mortimer's] complaint, taking its factual allegations to be true[,] and drawing all reasonable inferences in [Mortimer]'s favor."  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).  To survive a motion to dismiss, a complaint must meet a "plausibility standard."  Id. at 72.  Although we "'must accept as true all of [a complaint's] allegations . . . ,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Id. (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (second alteration in Harris).  This analysis is "'a context-specific task that requires [us] to draw on [our]

judicial experience and common sense.'" Id. (quoting Iqbal, 129 S. Ct. at 1950).

As for the district court's denial of Mortimer's subsequent motions to alter the judgment and for leave to amend its complaint, although we generally review such determinations for abuse of discretion, where the determination is based upon a legal interpretation, de novo review is appropriate. See Gorman v. Consol. Edison Corp., 488 F.3d 586, 592 (2d Cir. 2007); Fed. R. Civ. P 44.1. It is well-established that "[o]ne good reason to deny leave to amend is when such leave would be futile," specifically when "the additional information d[oes] not cure the complaint." Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir. 1995).

As previously noted, Mortimer's original complaint alleged that the FRG assumed liability for the Bonds, 35.5 % of which were issued in what later became West Germany. Mortimer's proposed amended complaint further alleged that "[t]he German Validation laws are no longer in force and do not currently apply to the obligations of West German origin." (Proposed Am. Compl. ¶ 22.) Because Mortimer has failed to plausibly allege that it either met the statutory validation requirements aimed to represent valid, legal obligation or was not required to do so, we conclude that it has failed to state a claim.

43

Starting from the premise that the FRG assumed liability for valid foreign currency bonds issued in the territory that became West Germany – which we accept for reasons already stated, the parties dispute whether Mortimer must comply with the validation procedures before seeking to recover on the West German Bonds in its possession. The FRG argues that no cause of action in this case lies because Mortimer failed to comply with the validation procedures. Mortimer does not assert that it complied with the validation procedures; instead, it contends that it need not do so. Specifically, Mortimer avers that "the Validation Law is no longer in effect," and that even if it is, Mortimer's claims are enforceable notwithstanding its refusal to register and submit the West German Bonds to a Validation Board. We address each argument in turn.

## A.    Continued Applicability of Validation Procedures

We first examine whether the bond validation procedures required by the Validation Law are still in force. Mortimer argues that the Unification Treaty's inclusion of the Validation Law in Annex I amounts to an implied agreement that the Validation Law is no longer in effect. This argument is without merit. Article 11 of the Unification Treaty provides that "international agreements to which [West Germany] is a party shall retain their validity, and with the exception of the treaties named in Annex I, shall also relate to [former East

44

German] territory." 30 I.L.M. at 471. Article 11's plain language only excludes treaties listed in Annex I from being extended to former East German territory; it in no way affects the validity of those treaties with respect to former West German territory. Cf. Reese Bros., Inc. v. United States, 447 F.3d 229, 235 (3d Cir. 2006) ("The usual meaning of the word 'and' . . . is conjunctive, . . . unless the context dictates otherwise, the 'and' is presumed to be used in its ordinary sense." (internal quotation marks omitted)). Moreover, the Validation Law is listed in the FRG's current statutory code, with only minor amendments irrelevant to this case since its enactment.[15]

The Validation Law's continued applicability is supported by the inclusion of both the 1953 and 1960 Treaties, which incorporate the Validation Law, in the United States Department

_____

[15] These amendments, the most recent of which was in December 2008, replaced the names of ministries and agencies or the titles of laws referred to in the Act when these name changes occurred. See Bereinigungsgesetz für deutsche Auslandsbonds in der im Bundesgesetzblatt Teil III, Gliederungsnummer 4139-2, veröffentlichten bereinigten Fassung, das zuletzt durch Artikel 82 des Gesetzes vom 17. Dezember 2008 (BGBl. I S. 2586) geändert worden ist [Securities Validation Act in the revised version published in Part III of the Federal Law Gazette under no. 4139-2, as most recently amended by Article 82 of the Law of December 17, 2008 (BGBl. I S. 2586)], BGBl.III, at 4139-2 (F.R.G.) (providing most recent version of the Validation Law and noting its 2008 amendment); Introductory Act of the Fiscal Code, Gesetz, Dec. 13, 1976, BGBl.I at 3341, art. 94, no. 3 (amending the Act by replacing the word Reichsabgabenordnung (Imperial Fiscal Code) with the term Abgabenordnung (Fiscal Code) when West Germany enacted a new Fiscal Code; Bundesgesetzblatt Teil I Fundstellennachweis A 4139-2 (Dec. 31, 2008) (listing amendments in 2001, 2003, and 2008 that made similar name changes).

of State's list of "treaties in force" as of January 1, 2009, <u>see</u> <u>United States Department of State, Treaties in Force: A List of</u> <u>Treaties and Other International Agreements of the United States</u> <u>in Force on January 1, 2009</u>, at 100-01 (2009), <u>available at</u> http://www.state.gov/documents/organization/123747.pdf (last visited January 29, 2010). Both the 1953 and 1960 Treaties confirm that the Validation Law may not be amended or modified "except as may be agreed between [West Germany] and the United States." 1960 Treaty, 12 U.S.T. at 944; 1953 Treaty, 4 U.S.T. at 888-89, Art. I. Therefore, inclusion on the "treaties in force" list suggests the conclusion that there has been no agreement between the United States and the FRG to nullify the Validation Law.

For the foregoing reasons, we conclude that the Validation Law's bond validation procedures continue to apply to the West German Bonds.

### B. Enforcability of Mortimer's West German Bonds

We now turn to the plausibility of Mortimer's attempt to enforce its West German Bonds as a "non-assenter"[16]--that is, a bondholder who neither registered nor presented its foreign currency bonds for validation in accordance with the Validation

---

[16] We use the term "non-assenter" because the London Debt Accord only deems bonds enforceable if the bondholder "assent[s] to the . . . conditions in respect of such debts," 4 U.S.T. at 453, Art. 15(1), which refers in the case of West German bonds to compliance with the Validation Law's procedures.

46

Law.  Mortimer contends that the Validation Law's sole restriction on such a claim for compensation is that it "may not be asserted to the prejudice of holders of validated foreign currency bonds," Validation Law, BGBl.II at 317, Art. 52(1), and that because the FRG made final payments to settling creditors in 1994, there is no possibility that validated bondholders would be prejudiced by a non-assenter's claim.

We find Mortimer's position unavailing.  First, Mortimer points to no language in any enactment that abrogates the validation requirements once all validated bondholders have been compensated.  In light of the express validation requirements in the Validation Law, 1953 Treaty, and London Debt Accord, see id. at 306, Art. 2 ("Foreign currency bonds remain valid only if they are validated . . . pursuant to this Law."); id. at 315, Art. 41 (placing the burden of proving the bonds' validity on the bondholder) id. at 317, Art. 50 (governing the "Invalidation of Bonds which have not been validated"); 1953 Treaty, 4 U.S.T. at 889, Art. II (providing that "[n]o bond . . . shall be enforceable unless and until it shall be validated" in accordance with the Validation Law); id. at 888 (providing that corresponding "benefits" "apply only to bonds which have been duly validated"); London Debt Accord, 4 U.S.T. at 453, Art. 15(1) (extending "benefit[s]" to a limited class of creditors who

47

"assent to the . . . conditions in respect of such debts"), we find Mortimer's non-assenter claim unpersuasive.

Additionally, we find Mortimer's argument regarding the intent of the validation procedures to be unreasonably narrow. While the validation procedures were created, in part, to facilitate assenting bondholders' receipt of payment, there is no reason to believe that prejudice to validated bondholders is the only reason to require validation. There is another significant reason to screen out and protect against illegitimate bond claims. As the 1953 Treaty explains, the Validation Law facilitates the settlement of West Germany's financial "obligations . . . with assurance that claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired." 1953 Treaty, 4 U.S.T. at 888. See generally Abrey, 153 F. Supp. at 339-42 (detailing the historical background leading to promulgation of validation procedures).

In any event, even assuming arguendo that enforcing Mortimer's claims would not prejudice holders of validated bonds, Mortimer failed to comply with the additional requirements that all non-assenting bondholders must meet. In addition to the requirement, cited by Mortimer, that a claim for compensation based on non-validated bonds not "prejudice of holders of validated [bonds]," Article 52(1) also requires that a claimant establish two preconditions prior to asserting such a claim: (1)

48

that the bonds at issue were "validated upon timely registration"; and (2) that "the failure to register [the bonds] was not due to . . . gross negligence." BGBl.II, at 317. Moreover, the next paragraph of the provision, Article 52(2), states that the right to compensation for non-validated bonds created by Article 52 "can be asserted *only after it has been finally adjudicated* that the conditions" set forth in Article 52(1) have been met. *Id. (*emphasis added). Article 52(2) further states that "[e]xclusive jurisdiction to make such adjudication shall rest with the Chamber of Settlement of Securities of the district in which the issuer has its seat." *Id.*

These additional requirements make plain that the absence of prejudice to the holders of validated bonds is necessary, but not sufficient, to permit Mortimer to bring claims relating to the West German Bonds under Article 52 without their prior validation pursuant to the Validation Law. As Mortimer has not alleged that the preconditions to bringing a compensation claim under this provision were adjudicated in its favor or even that, as a factual matter, the preconditions are satisfied with respect to the West German Bonds, we hold that Mortimer's argument fails on its own terms.

In sum, a non-assenter can only enforce bonds covered by the Validation Law after complying with the validation procedures and

49

explaining why any delay in doing so is excusable. Like the district court, we hold that Mortimer, by not satisfying either criterion, has failed to set forth a plausible basis in either the complaint or the proposed amended complaint for enforcing the West German Bonds at this stage. Indeed, allowing Mortimer to do so would undercut the purpose of the Validation Law by eliminating any guarantee that Mortimer's West German Bonds, allegedly valued at over $400,000,000, are in fact legitimate. Our decision is consistent with past cases, which have evaluated the enforceability of foreign currency bonds covered by the Validation Law only after the bondholder has registered and submitted its bonds for evaluation in accordance with the Law, and the Validation Board has adjudicated their validity. See Teplin v. Fed. Republic of Germany, No. 81-1874, 1982 U.S. App. LEXIS 12629, at *2-3 (D.C. Cir. Aug. 18, 1982) (per curiam) (finding a bondholder's claims to be "not properly before th[e] court" because he failed to validate the bonds, "thus making them enforceable in U.S. courts"); cf. Cavac Compania Anonima Venezolana de Administracion y Comercio v. Bd. for the Validation of German Bonds in the United States, 189 F. Supp. 205, 208 (S.D.N.Y. 1960) (permitting arbitration after a Validation Board refused to validate the bonds at issue); Abrey, 153 F. Supp. at 338 (permitting an independent trial respecting the bonds' validity after they were declared invalid by a Validation Board).

50

We therefore affirm the dismissal of Mortimer's claims respecting the West German Bonds and the denial of leave to amend.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED, in part on alternative grounds.