[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 01, 2007
THOMAS K. KAHN
CLERK

No. 06-16507

D. C. Docket No. 01-00221-CV-FTM-29-DNF

LYDIA ROSARIO,  AUDRA PHILLIPS, on behalf
of themselves and all others similarly situated,

Plaintiffs-Appellants,

versus

AMERICAN CORRECTIVE COUNSELING SERVICES, INC.,
DON R. MEALING, KELLY KEAHEY, JOSEPH AYALA,
DENISE NIELSON,

Defendants-Appellees,

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

**(November 1, 2007)**

Before CARNES and BARKETT, Circuit Judges, and COHN,[*] District Judge.

————————————————

[*] Honorable James I. Cohn, United States District Judge for the Southern District of
Florida, sitting by designation.

COHN, District Judge:

This is an appeal by Lydia Rosario and Audra Phillips from the entry of summary judgment against them on their claims of violations of the federal Fair Debt Collection Practices Act (FDCPA) and the Florida Consumer Collection Practices Act (FCCPA).

## I. BACKGROUND

Florida statutes authorize state attorneys to establish a bad check diversion program, "either within the state attorney's office or through an independent contractor." Fla. Stat. § 832.08. The Twentieth Judicial Circuit State Attorney's Office ("SAO") contracts with American Corrective Counseling Services, Inc. ("ACCS"), a private company based in California, for ACCS to operate a Bad Check Restitution Program ("Program") on behalf of the SAO for the purpose of recovery of restitution for victims of non-sufficient funds and account-closed type checks. Plaintiffs-Appellants each had a check referred to the Program. Each received notices and letters sent by ACCS on SAO stationery offering participation in the Program. The letters sought payment of the amount of the check, plus fees of at least $125, including $75 for participation in an eight-hour educational class. The letters state that failure to participate may result in criminal prosecution by the SAO.

2

Plaintiffs allege that ACCS and various individual officers of ACCS[1] have violated numerous provisions of the FDCPA and FCCPA. In particular, Plaintiffs allege violations of 15 U.S.C. § 1692d (harassment); § 1692e(1) (false or deceptive claims regarding criminal justice powers); § 1692e(2)(A) (misrepresenting legal status of debt); § 1692e(4) (creating false impression that civil collection matters criminally enforceable); § 1692e(5) (making threats of action not intended or that could not legally be taken); § 1692e(7) (implying consumer committed crime); § 1692e(9) (overall appearance of letters gives impression they are from State Attorney's office); § 1692e(10) (employing deceptive means to collect a debt or obtain information about a consumer); § 1692e(11) (failing to contain warning that letter is from debt collector); § 1692e(13) (giving false impression that letters are legal process); § 1692e(14) (using name other than own, *i.e.* State Attorney); § 1692f(1) (requesting amounts not authorized by contract or Florida law); and § 1692g(a) (failing to provide validation notice).

The particular allegations as to the FCCPA include Fla Stat. § 559.72(1) (simulating a law enforcement officer); § 559.72(7) (harassment); § 559.72(9) (asserting existence of right when known such right does not exist); § 559.72(10) (simulating legal process or giving appearance of being approved by a government

---

[1] For purposes of this opinion, the Court refers collectively to ACCS and the various ACCS officers as "ACCS."

agency, when it is not); § 559.72(11) (using attorney's stationery); and § 559.72(12) (oral communication giving false impression that person is associated with an attorney).

After a period of discovery, Plaintiffs moved for summary judgment on their claims, while Defendants moved for summary judgment on grounds they are entitled to Eleventh Amendment immunity as an agent or instrumentality of the SAO, which is an arm of the State of Florida. The District Court granted Defendants' motion, dismissing the case without prejudice due to Eleventh Amendment immunity. *Rosario v. American Corrective Counseling Services, Inc.*, 2006 WL 3313845 (M.D.Fla Nov. 15, 2006). Plaintiffs filed this appeal.

## II. THE BAD CHECK PROGRAM

A review of the relationship between ACCS and the SAO begins with the contract between ACCS and the SAO and the governing state law. The contract explicitly states that the relationship is one of an independent contractor hired to run the Program. The contract prohibits ACCS from acting as an agent for the State Attorney or Twentieth Judicial Circuit. In addition to this clear contractual intent for ACCS to be an independent contractor, the Florida law that authorizes state attorneys to establish bad check diversion programs also specifically states that such programs may exist "either within the state attorney's office or through an independent

4

contractor." Fla. Stat. § 832.08.

The SAO for the Twentieth Judicial Circuit did run an in-house diversion program prior to the implementation of the contract with ACCS in December of 1998. Once ACCS was hired to run the program, however, certain procedures changed. After bad check complaints are received by the SAO, typically through law enforcement agencies, SAO clerical staff review them only to confirm that the check writer, recipient and amount correspond to the list of checks in a particular bundle, and to pull out those checks over $1,000. There is no attorney review prior to the SAO's sending of the check bundles to ACCS at its California offices.[2]

ACCS then sends form letters that have been approved by an assistant state attorney at the SAO to bad check writers. These letters appear to be on SAO letterhead; however, the contact mailing address and phone number are separately maintained by ACCS and not the SAO. The letters offer participation in the Program, which requires the participant to make payment of the full amount of the check, statutory fees, a class fee of $75, and other fees and to attend an eight-hour class. Payments made under the Program are payable to the SAO and deposited in an

---

[2] ACCS sometimes receives bad checks directly from merchants. ACCS hires a local customer relations representative, selected by the SAO from a list of finalists provided by ACCS, to market the Program to local merchants. This marketing has increased the number of bad checks in the Program. According to the SAO's liaison to ACCS, part of the marketing pitch to merchants is that the Program provides local merchants with a better financial result than other collection companies can offer. Janeen Diebler Deposition, R. 167 at p. 116-17; Exhibit 30 (section describing monthly activities of customer relations representative).

account controlled by ACCS. On a regular weekly or monthly basis, ACCS distributes the funds from this account to victims, the SAO (which receives a percentage of fees per the contract), and itself (which gets the educational fee plus a percentage of other fees). If a bad check writer does not complete participation in the Program, ACCS sends the check and complaint form back to the SAO. At that point, attorneys in the SAO determine whether to prosecute the case, depending upon their own analysis of the case.

During the time ACCS processes the bad checks and seeks payment from the bad check writers, the SAO does not have regular contact with ACCS. There is no supervision of the day-to-day activities of ACCS, although the letters sent by ACCS have previously been approved by the SAO. A monthly report is prepared by ACCS describing the number of checks, a breakdown of checks by the largest ten victims (merchants), an accounting of payments from the bank account, and a check to the SAO from that account.

The contract also contains an indemnity clause which requires ACCS to indemnify and defend the Twentieth Judicial Circuit and its officers, thus including the SAO, from and against any and all claims and losses, "unless arising out of the sole negligence or willful conduct of Judicial Circuit." R. 160-4, ¶ 17.

### III. THE DISTRICT COURT DECISION

The district court agreed with Defendants as to their Eleventh Amendment

immunity argument and granted summary judgment for Defendants. In granting this motion, the district court relied upon *Shands Teaching Hospital and Clinics, Inc. v. Beech Street Corp.*, 208 F.3d 1308, 1311 (11th Cir. 2000) ("*Shands*"), concluding that ACCS acted as an agent for the SAO in connection with the events that form the basis for the claims. The district court did reference the Florida statute that authorized state attorneys to utilize independent contractors to establish a bad check program, and considered the various contractual requirements for SAO oversight of ACCS. The district court also noted that ACCS was an independent contractor who had no authority to bind the SAO, and that ACCS agreed to indemnify and defend the SAO as to all claims and losses as a result of its work. This Court reviews *de novo* the grant of a summary judgment motion, viewing the facts and drawing reasonable inferences in favor of the nonmoving party. *Alabama-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1254 (11th Cir. 2007).

### IV. ELEVENTH AMENDMENT IMMUNITY

The Supreme Court has "consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc., 506 U.S. 139, 144, 113 S.Ct. 684, 687 (1993). The immunity does not extend to counties or other units of government. However, the Supreme Court has also said that "only states and arms of the State possess immunity from suits authorized by

7

federal law." *N. Ins. Co. of N.Y. v. Chatham County, Ga.*, 547 U.S. 189, 193, 126 S.Ct. 1689, 1693 (2006). *See also Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (*en banc*). In this case, there is no dispute that the SAO is an arm of the State of Florida. Rather, the dispute concerns the status of ACCS and its relationship with the SAO.

A. *Shands*

The test that governs whether Eleventh Amendment immunity may extend to defendants other than the state is discussed in *Shands*. The factors to be considered are as follows: "1) how state law defines the entity, (2) what degree of control the State maintains over the entity, and (3) from where the entity derives its funds and who is responsible for judgments against the entity." *Shands*, 208 F.3d at 1311. In *Shands*, the plaintiff hospital sued third-party claims administrators for the state employees' health plan for non-payment under the network agreement. The Florida statute governing the state employees health plan authorized the Florida Department of Management Services ("DMS") to employ a professional association to process claims. Fla. Stat. Ann. § 110.123(3)(d). The contract between the state agency and the administrator had a clause allowing for termination by the DMS for "convenience," for inspection and audit rights by DMS, and for state approval of subcontracts and printed material. Shands, 208 F.3d at 1311 n.2. However, the DMS

8

retained final decision-making authority concerning the existence of coverage or benefits under the health plan.  Id. at 1310; Fla. Stat. Ann. § 110.123(5)(c).

The Court then considered the test it had previously set out.  In so doing, it stated as follows: 1) the "pertinent inquiry" is the company's "function or role in a particular context;" 2) the question is "whether and to what extent these corporations are contractually acting as representatives of the State;" 3) the companies are protected when they "are clearly acting as agents of the state;" and 4) the "dispositive question for Eleventh Amendment purposes is whether a judgment against [the contractors] would implicate the state treasury or interfere with the administration of the state group insurance program. . . ."  208 F.3d at 1311.  The Court did note that it "found no case directly on point that has accorded Eleventh Amendment immunity to a private corporation such as [these contractors]. . . ."  Id.

In looking at Florida law and the implementing contracts, the Court in Shands concluded that the contractors were simply administrators acting at the behest of the State with reference to the health insurance program.  Although the contractors made initial benefits decisions, the retention of final decision-making authority as to benefits determinations by DMS meant that the contractors were agents of DMS.  Id. at 1312.  In addition, the Court concluded that a judgment against the contractors with regard to disputes over benefits would affect the state treasury, as "the state insurance fund would be obliged to increase payments on the number of covered services."  Id.

9

## B.  ACCS

In the present case, the statutory language and the language of the contract between ACCS and the SAO both specifically state that ACCS is an independent contractor, not an agent.  The district court, however, relying upon *Shands*, concluded that ACCS was, in fact, acting as an agent of the SAO in sending the letters that form the basis of the claims.   The district court also rested its ruling upon the contract provisions that describe ACCS's work in the daily management of all clerical and accounting functions related to the bad check program, and the SAO's responsibility to assist and direct ACCS with planning and development of polices, procedures, and other matters.

The deposition evidence from the SAO liaison to ACCS, Janet Diebler, the Executive Director of the SAO, Daniel Pearlman, and the present supervisor of county court prosecutors, Assistant State Attorney Gary O'Nolan, reveals that clerical review only is done by the SAO before the file goes to ACCS, and attorney review is performed after the bad check is returned if diversion is not completed.  Although the allegedly unlawful form collection letters are sent after review and approval by the SAO, with content partially specified by Fla. Stat. § 832.08(3), there is no supervision by the SAO during ACCS's collection efforts of communications regarding the bad check amount and related fees.  These communications are the subject of this action under the FDCPA.

Defendants/Appellees assert that as in Shands, they are merely administrators of the SAO's bad check program. However, ACCS fails to meet each element of the Shands test. First, in this case, state law and the contract define ACCS as an independent contractor, and not an agent. Florida statutes make a distinction between "independent contractor" and "agent." Compare Fla. Stat. § 30.24(2)(b) with Fla. Stat. § 766.1115. Thus, if the Legislature intended operators of bad check diversion programs to be considered "agents," it could have so stated in its statutory scheme and called the operators "agents," instead of "independent contractors," as it instead chose to do. Indeed, to the contrary, the specific language in the contract prohibits ACCS from acting as an agent of the SAO.[3]

Recently, this Court concluded in the related context of a military contractor that status as a common law agent is necessary but not sufficient to obtain derivative immunity under the government's *Feres* doctrine immunity. *McMahon v. Presidential Airways, Inc.*, 11th Cir. 2007, __ F.3d ___ (No. 06-15303, October 5, 2007) (U.S. Supreme Court <u>*Feres*</u> doctrine precludes government liability for service-related injuries to soldiers). Although the constitutional underpinnings of Eleventh Amendment jurisprudence are distinct from the history of *Feres* doctrine case law, the

---

[3] Florida case law also supports the concept that parties cannot later change the legal status of their relationship from the contract language. *Anthony Distributors, Inc. v. Miller Brewing Co.*, 882 F.Supp. 1024, 1031 (M.D.Fla. 1995).

11

*McMahon* opinion's discussion of derivative immunity and agency bears mention in the context of the present case.  Here, ACCS cannot show that it is a common law agent because of the contractual and statutory language governing the bad check program.

As to the element of control over ACCS, we note that the SAO does have some control over the content of the letters, as long as ACCS uses the previously approved form letters.  However, the SAO exercises no other control over the day-to-day activities of ACCS with regard to the collection efforts under the Program.  As to the ability to end ACCS's services, because the contract requires "cause" for termination prior to the completion of repeating three-year terms, such control is limited.  *Hinson v. Edmond*, 192 F.3d 1342, 1346-47 (11th Cir. 1999) (concluding that prison health care director employed by contractor not eligible for qualified immunity for § 1983 claim where County could not hire or fire contractor employees).[4]

As to the third *Shands* element of state funding and liability, ACCS does not receive any funding from the State of Florida.  Defendant argues that because ACCS is compensated from revenues of the Program, and part of those revenues would belong to the SAO, that ACCS is a state-funded entity.  At oral argument and in its Supplemental Letter Authority, ACCS asserts that because all funds paid by Program

---

[4] The *Hinson* opinion relied upon *Richardson v. McKnight*, 521 U.S. 399 (1997), which rejected qualified immunity for prison guards employed by a private contractor.

participants are made payable to the Twentieth Judicial Circuit, Plaintiffs are essentially seeking a disgorgement of these funds, part of which would be paid to the SAO. However, the depositions of the SAO employees, including the Executive Director who acts as a chief financial officer, as well as ACCS's Supplemental Letter Authority, confirm that the bank account set up to receive payments under the Program is controlled by ACCS, which acts as a fiduciary in disbursing funds by checks signed by ACCS's President to victims, the SAO, and itself. The record does not reflect that the collected funds, as they sit in that account, are state property.

Even if part of those funds were considered state property, it is undisputed that ACCS is not paid by state revenues. The Supreme Court has stated that the proper focus is not on the use of profits, but rather whether the State is obligated to bear and pay any resulting indebtedness if the program's expenditures exceed its receipts. *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 51, n. 21, 115 S.Ct. 394, 406 (1994) (rejecting immunity over "an agency that consumes no state revenues but contributes to the State's wealth"). In this case, the clear terms of the contract indicate that no indebtedness could ever occur -- ACCS is paid only when it successfully collects on a bad check.

Moreover, as *Shands* and other Eleventh Circuit cases have noted, the most important factor in determining immunity is who is responsible for judgments against the entity. *Manders v. Lee*, 338 F.3d 1304, 1325 (11th Cir. 2003) (*en banc*). The

13

ACCS contract specifically indemnifies the SAO, except for "sole negligence" of SAO employees. Defendants speculate that there could be circumstances under this provision in which they are not required to indemnify the SAO, in which case the State of Florida would be responsible for a judgment. However, in this action the only claims asserted are against ACCS and its principals for the content of its communications with bad check writers. Though the SAO approved the communications in form, the actions allegedly in violation of the law cannot be due to the "sole negligence" of the SAO, a non-party to this litigation. Thus, a money judgment in this case against ACCS would not impose any liability upon the SAO. U.S. ex rel. Barron v. Deloitte & Touche, LLP, 381 F.3d 438, 440, n.7 (5th Cir. 2004) (immunity rejected for contractor who processed claims and distributed Medicaid funds for the State of Texas based on indemnity language of contract).

A related consideration to financial liability is legal liability. Regents of the University of California v. Doe, 519 U.S. 425, 430-31, 117 S.Ct. 900 (1997). If a state agency is legally liable for a judgment but indemnified by a non-state entity, then Eleventh Amendment immunity would still apply. However, in this case, the SAO is not being sued. It cannot have legal liability in this action.

Defendant also argues that under *Shands*, an alternative finding of interference with the administration of government programs leads to Eleventh Amendment immunity. *Shands*, 208 at 1311, *citing Pennhurst State School & Hosp. v. Halderman,*

14

465 U.S. 89, 101, n.11, 104 S.Ct. 900, 908 (1984). However, neither decision elaborates on the standards to evaluate what extent of "interference" triggers Eleventh Amendment immunity. ACCS asserts that forcing it to change its SAO-approved letters would interfere with the SAO Program. Plaintiffs assert that ACCS can comply with both the contract and the FDCPA even if the language of the letters were changed.

In *Shands*, the Court concluded that issuing a declaratory judgment interpreting the State's obligations regarding "covered services" under the state health plan in favor of Shands Hospital would "impermissibly intrude" upon future administration of the state program because payments from state funds would increase. In the present case, a finding that ACCS is covered by the FDCPA would not affect state funds, as previously explained above.

This action does not impede the SAO's prosecutorial decisions regarding bad check writers -- rather, it is the conduct of ACCS and the content of the communications sent to Plaintiffs that are alleged to violate federal law. The existence of the bad check diversion program is also not challenged. If imposition of FDCPA requirements over ACCS interferes with the independent contractor's ability to successfully collect on bad checks, then ACCS can make a business decision not to continue with the contract. The SAO in turn can run the program in-house, as it did prior to contracting with ACCS. The standard for Eleventh Amendment immunity

15

has never been held to apply simply because an independent contractor performs some government function. Rather, under the factors described above, in this action ACCS is not entitled to Eleventh Amendment immunity.

## V. CONCLUSION

ACCS is a private, for-profit corporation acting as an independent contractor to run a bad check diversion program for the SAO. Pursuant to Florida law, the ACCS contract, the actual operation of the bad check program, and Eleventh Circuit precedent, ACCS is not entitled to Eleventh Amendment immunity.[5]

The district court's order granting summary judgment to ACCS on the grounds of Eleventh Amendment immunity is REVERSED. The matter is REMANDED to the district court for further proceedings consistent with this opinion.

---

[5] The Court need not address Plaintiffs' Ex Parte Young argument concerning the exception to Eleventh Amendment immunity for prospective declaratory and/or injunctive relief, and ACCS's responsive argument that Congress amended the FDCPA, 15 U.S.C. § 1692p, to recognize the existence of these bad check diversion programs by setting out a test for such a program to be considered exempt from the FDCPA.