[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-14378

_____

D.C. Docket No. 1:08-cv-20198-CMA

WORLD HOLDINGS, LLC,
a Florida Limited Liability Company,

Plaintiff - Appellant,

versus

FEDERAL REPUBLIC OF GERMANY,
a foreign state,

Defendant - Appellee.

_____

No. 11-14457

_____

D.C. Docket No. 1:10-cv-23577-CMA

SOVEREIGN BONDS EXCHANGE LLC,
HELMUT GAENSEL,
MICHAEL YOHE,
JAMES BRIANT,
CONRAD CURREN,

individually by and on behalf of
all persons similarly situated,

Plaintiffs - Appellants,

versus

FEDERAL REPUBLIC OF GERMANY,

Defendant - Appellee.

———————————————

No. 11-14461
———————————————

D.C. Docket No. 1:10-cv-21944-CMA

SOVEREIGN BONDS EXCHANGE LLC,

Plaintiff - Appellant,

versus

FEDERAL REPUBLIC OF GERMANY,
HSH NORDBANK AG, KIEL,
successor to Landesbank der Provinz Schleswig-Holstein,
d.b.a. HSH Nordbank AG New York,
WESTLB AG, DUESSELDORF,
successor to Landesbank der Rheinprovinz,
Landesbank der Provinz Westfalen and
Landesbank fur Westfalen (Girozentrale),
d.b.a. WestLB AG New York,
HELABA LANDESBANK HESSEN-THUERINGEN,
FRANKFURT AM MAIN,
d.b.a. Helaba Landesbank Hessen-Thueringen New York,
LBBW LANDESBANK BADEN-WURTTEMBERG, STUTTGART,
successors to Landeskreditbank Baden-Wurttemberg,
d.b.a. LBBW Niederlassung New York, LBBW New York,

DEKABANK DEUTSCHE GIROZENTRALE, NORDDEUTSCHE
LANDESBANK GIROZENTRALE HANNOVER,
successor to Hannoversche Landeskreditanstalt,
d.b.a. Norddeutsche Landesbank Girozentrale New York,

Defendants - Appellees,

DEUTSCHE LANDESBANKENZENTRALE AG,
Successor/agent for Landesbank Der Provinz
Ostpreussen Hannoversche Landeskreditanstalt,
Provinzialbank Pommern, Landesbank der Provinz
Schleswig-Holstein, ProvinzialHilfskasse Fur Die
Provinz Niederschlesien, Brandenburgische Provinzialbank,

Defendant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(November 15, 2012)

Before DUBINA, Chief Judge, PRYOR and HILL, Circuit Judges.

PRYOR, Circuit Judge:

In these three consolidated appeals, we must decide issues about the

enforceability of German bonds issued during the period between World War I and

World War II.  The first appeal involves a complaint against the Federal Republic

of Germany filed by World Holdings, LLC, for breach of contract regarding its

Dawes and Young bonds.  The second appeal involves a complaint against

Germany filed by Sovereign Bonds Exchange, LLC, for breach of contract

3

regarding its Dawes, Young, and municipal bonds. The third appeal involves a complaint against Germany and six German banks filed by Sovereign Bonds for breach of contract regarding its Agra bonds. These appeals present questions of subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611, and the interpretation of three post-World War II treaties: the Agreement on German External Debts, Feb. 27, 1953, 4 U.S.T. 443, 333 U.N.T.S. 3, also known as the London Debt Agreement; the Agreement Between the Government of the United States of America and the Government of the Federal Republic of Germany Regarding the Validation of Dollar Bonds of German Issue, U.S.-Fed. Republic of Ger., Feb. 27, 1953, 4 U.S.T. 797, also known as the 1953 Validation Procedures Treaty; and the Agreement Between the United States of America and the Federal Republic of Germany Regarding Certain Matters Arising from the Validation of German Bonds, U.S.-Fed. Republic of Ger., Apr. 1, 1953, 4 U.S.T. 885, also known as the 1953 Validation Treaty. The district court granted a summary judgment in favor of Germany and against the complaint filed by World Holdings; dismissed the complaint filed by Sovereign Bonds regarding its Dawes, Young, and municipal bonds for failure to state a claim; and dismissed the complaint filed by Sovereign Bonds regarding its Agra bonds for lack of subject matter jurisdiction and, alternatively, for failure to state a claim.

4

We are asked to decide (1) whether the Foreign Sovereign Immunities Act granted the district court jurisdiction over the complaint filed against Germany by Sovereign Bonds to enforce Agra bonds issued by banks in the territory that became East Germany; (2) whether holders of Dawes, Young, municipal, and Agra bonds who did not assent to the settlement offer in the London Debt Agreement must, under the 1953 Validation Treaty, validate their bonds before they may enforce them in an American court; (3) whether the complaint filed by World Holdings to enforce its validated bonds was barred by the statute of limitations; and (4) whether the district court abused its discretion when it denied discovery to Sovereign Bonds to determine whether any of its bonds had been validated.  We conclude that the district court had jurisdiction under the Foreign Sovereign Immunities Act over the complaint against Germany filed by Sovereign Bonds regarding its Agra bonds issued in the territory that later became East Germany; all the bonds are subject to the 1953 Validation Treaty and must be validated before they may be enforced in American courts; the complaint filed by World Holdings to enforce its validated bonds is untimely; and the district court did not abuse its discretion when it denied discovery to Sovereign Bonds on the issue of validation. We vacate in part and affirm in part.

5

## I. BACKGROUND

We divide the background in five parts.  First, we explain the shared historical background of the three appeals.  Second, we recount the procedural history of the litigation by World Holdings to enforce its Dawes and Young bonds.  Third, we recount the procedural history of the litigation by Sovereign Bonds to enforce its Dawes, Young, and municipal bonds.  Fourth, we describe the procedural history of the action filed by Sovereign Bonds to enforce its Agra bonds.  Fifth, we discuss the relevant aspects of this appeal.

### A.  The Historical Background.

In an effort to rehabilitate its economy after World War I, Germany sold bonds in foreign countries.  In 1924, Germany made a public offering of 7 Percent External Gold Bonds, better known as "Dawes bonds," on the New York Stock Exchange.  These bonds were backed by the full faith and credit of Germany, held absolute priority over other German debts, and provided for collateral security from taxes on tobacco, beer, sugar, and the German spirits monopoly.  In 1930, Germany made an offering of 5 ½ Percent International Gold Bonds, known as "Young bonds," on the New York Stock Exchange.  These bonds were also backed by the full faith and credit of Germany, were entitled to priority over all German debts except the Dawes bonds, and provided for collateral security from a direct annual tax on the German Railway Company.

6

On June 1, 1928, fourteen provincial and communal banks issued the German Provincial and Communal Banks Consolidated Agricultural Loan Bonds, also known as "Agra bonds."  These loans were issued for the purpose of improving agricultural conditions in Germany.  The banks involved in the issuance were owned in whole or in part by a German province and each province was legally responsible for all obligations of its banks.  A majority of the obligor banks for the Agra bonds were located in territory that would eventually become East Germany.

When Adolph Hitler gained power before World War II, Germany defaulted on many of its foreign debts.  Germany defaulted on the Dawes and Young bonds and began aggressively purchasing the bonds at deep discounts.  Instead of cancelling the repurchased certificates, Germany held the certificates in Berlin banks.  Germany also issued a moratorium on the payment of the Agra bonds.

After World War II, the United States and West Germany entered a multinational treaty known as the London Debt Agreement to "remove obstacles to normal economic relations between the Federal Republic of Germany and other countries."  London Debt Agreement, preamble, 4 U.S.T. at 445.  The Agreement was signed in February 1953 and created a framework for the settlement of claims against the West German government, and it constituted an offer of settlement to all holders of bonds covered by the Agreement.  See id. at 453.  If a bondholder

7

accepted the settlement offer, he would be guaranteed payment at a lower rate than the rate to which he would have otherwise been entitled. If a bondholder refused to accept the settlement offer, he maintained his preexisting rights of enforcement. But West Germany adopted a policy of waiting to pay bondholders who did not assent to the Agreement until all bondholders who did assent had been paid.

On the same day that West Germany signed the London Debt Agreement, it entered a bilateral agreement with the United States that established procedures for the validation of several German bonds. 1953 Validation Procedures Treaty, 4 U.S.T. at 797. This treaty was motivated by concerns that large numbers of bonds held in Berlin had been stolen by Soviet forces at the end of the war and could be reintroduced into commerce alongside legitimate claims of American creditors. To combat this fraud, bondholders would have to prove that their bonds were located outside of Germany when Berlin fell to Soviet forces. Id. at 800, 822.

The 1953 Validation Procedures Treaty provided several different ways to validate a bond. Id. at 822–23. A registrant could, for example, submit a bank document stating that the bondholder acquired the bond from that bank before January 1, 1945. Id. at 822. A registrant could also provide his own affidavit stating the date and manner of acquisition of the bond, the prior owner of the bond, and the place where the bond was held on January 1, 1945. Id. at 823. And the treaty permitted a registrant to "submit such documents as he considers the best

evidence available to him, which may include affidavits of persons other than the registrant" to prove that the bond was located outside of Germany during World War II. Id. The treaty incorporated the West German Validation Law that listed the bonds subject to validation. See id. at 802.

In April 1953, the United States and West Germany signed a treaty that required German bonds to be validated before they could be enforced in American courts:

> No bond, coupon, dividend warrant, renewal certificate, subscription warrant or other secondary instrument referred to in the first sentence of Article I above shall be enforceable unless and until it shall be validated either by the Board for the Validation of German Bonds in the United States established by the Agreement on Validation Procedures, or by the authorities competent for that purpose in the Federal Republic.

1953 Validation Treaty, 4 U.S.T. at 889. Although the official registration period established in the 1953 Validation Procedures Treaty occurred from 1953 to 1958, the district court concluded that validation is still possible under that treaty. See 1953 Validation Procedures Treaty, 4 U.S.T. at 839, 855–56. Despite this finding, the German government has not responded to requests by World Holdings about where it may seek validation of its bonds.

In 1990, East Germany and West Germany formally reunited. Under the Unification Treaty, the Federal Republic of Germany assumed the debts of East Germany. Unification Treaty, Fed. Republic of Ger.-Ger. Democratic Republic,

Art. 23, Aug. 21, 1990.  The Unification Treaty also provided that "international treaties and agreements to which the Federal Republic of Germany is a contracting party . . . shall retain their validity."  Id. Art. 11.  The London Debt Agreement provided for review and reconsideration of its settlement terms upon reunification with Germany, but no steps have been taken to conduct this review.

B. *The Litigation by World Holdings to Enforce Its Dawes and Young Bonds.*

On January 23, 2008, World Holdings filed a complaint against Germany for breach of contract with respect to over 2,000 Dawes and Young bonds owned or controlled by World Holdings.  Only 136 of the more than 2,000 bonds owned or controlled by World Holdings have been validated.  Germany filed a motion to dismiss for lack of subject matter jurisdiction, under the Foreign Sovereign Immunities Act, but the district court denied the motion.  In an interlocutory appeal, we affirmed and held that the issuance of bonds fell within the commercial-activity exception to foreign sovereign immunity.  World Holdings, LLC, v. Federal Republic of Germany, 613 F.3d 1310, 1316 (11th Cir. 2010).

On remand, the district court granted summary judgment to Germany. World Holdings argued that the validation requirement did not apply to bondholders who refused to assent to the London Debt Agreement, but the district court rejected that argument.  The district court concluded that World Holdings could not recover on its unvalidated bonds because the 1953 Validation Treaty

10

unambiguously required validation of Dawes and Young bonds before the bonds could be enforced in American courts. And the district court ruled that World Holdings could not recover on its validated bonds because its complaint was barred by the statute of limitations.

## C. The Litigation by Sovereign Bonds to Enforce Its Dawes, Young, and Municipal Bonds.

In 2010, Sovereign Bonds filed a complaint against Germany for breach of contract. The factual allegations in that complaint are nearly identical to those alleged by World Holdings. The main factual difference between the two matters is that Sovereign Bonds holds eight kinds of municipal bonds in addition to its Dawes and Young bonds. But Sovereign Bonds concedes that these municipal bonds would be subject to the London Debt Agreement and the 1953 Validation Treaty if the Dawes and Young bonds are subject to those agreements.

The district court dismissed the complaint because Sovereign Bonds had failed to allege that its bonds have been validated. Sovereign Bonds requested limited discovery, but the district court denied this request and ruled that "[p]arties may not file insufficient complaints with the hope of receiving discovery to make them sufficient." Sovereign Bonds conceded that amending would be futile at that time, and the district court dismissed the matter without prejudice.

11

*D. The Litigation by Sovereign Bonds to Enforce Its Agra Bonds.*

Sovereign Bonds also filed a complaint in 2010 for breach of contract against Germany and several banks that Sovereign Bonds alleged were successors in interest to the banks that issued the Agra bonds. Sovereign Bonds argued that it was not required to validate its Agra bonds. With respect to its Agra bonds issued by banks in the territory that became West Germany, Sovereign Bonds repeated the argument of World Holdings that bondholders who did not assent to the settlement offer in the London Debt Agreement are not subject to the 1953 Validation Treaty. With respect to its Agra bonds issued by banks in the territory that became East Germany, Sovereign Bonds contended that those bonds were not subject to the Validation Law.

The district court granted the motion by Germany to dismiss for lack of subject matter jurisdiction and for failure to state a claim. The district court concluded that "[i]f a bond is 'East German,' the Court lacks subject matter jurisdiction over the bond" and "[i]f a bond is 'West German,' it must be validated to be enforceable." The district court determined that Sovereign Bonds had not alleged any facts to establish that East Germany had assumed liability for the Agra bonds or that modern Germany was subject to suit under the Foreign Sovereign Immunities Act for those bonds. The district relied on the decision of the Second Circuit in Mortimer Off Shore Services, Ltd. v. Federal Republic of Germany, 615

12

F.3d 97 (2d Cir. 2010), in which the court had determined that it lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act because East Germany was a successor state of the German Reich and had never assumed liability for debt incurred by banks in the territory that became East Germany, id. at 109.  The district court reasoned that, because East Germany had never assumed the debt of the German Reich, the Federal Republic of Germany could not have assumed that debt upon reunification.  The district court also concluded, in the alternative, that Sovereign Bonds had failed to state a claim because the "East German" Agra bonds are also subject to the validation requirement.

Sovereign Bonds sought discovery on the issue of validation, but the district court denied the motion and ruled again that "[p]arties may not file insufficient complaints with the hope of receiving discovery to make them sufficient."  When Sovereign Bonds failed to amend its complaint to allege validation, the district court dismissed the complaint without prejudice, even though it had granted a motion to dismiss with respect to Germany, not the German banks.  The German banks then filed a motion for judgment on the pleadings.  The district court held that it had already dismissed the case and the motion was moot.

### E.  The Appeals.

World Holdings appealed the summary judgment against its complaint, and Sovereign Bonds appealed the dismissal of its complaints.  After briefing, we

13

heard oral argument of these appeals on the same day.  We now <u>sua sponte</u> consolidate them for final resolution.

## II.  STANDARD OF REVIEW

We review all but one of the issues presented <u>de novo</u>.  "This court reviews <u>de novo</u> the grant of a summary judgment motion, viewing the facts and drawing reasonable inferences in favor of the nonmoving party."  <u>Rosario v. Am. Corrective Counseling Servs., Inc.</u>, 506 F.3d 1039, 1043 (11th Cir. 2007).  "We review the district court's grant of defendants' motion to dismiss for failure to state a claim <u>de novo</u> as well, and we must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff."  <u>Henderson v. Wash. Nat'l Ins. Co.</u>, 454 F.3d 1278, 1281 (11th Cir. 2006) (internal quotation marks omitted).  "We review <u>de novo</u> the district court's determination that it lacked jurisdiction under the [Foreign Sovereign Immunities Act]."  <u>Aquamar S.A. v. Del Monte Fresh Produce N.A.</u>, 179 F.3d 1279, 1289 (11th Cir. 1999).  "This court reviews <u>de novo</u> the district court's interpretation of a treaty . . . ."  <u>In re Comm'r's Subpoenas</u>, 325 F.3d 1287, 1292 (11th Cir. 2003), <u>overruled on other grounds by</u> <u>Intel Corp. v. Advanced Micro Devices, Inc.</u>, 542 U.S. 241, 124 S. Ct. 2466 (2004).  "We review the district court's interpretation and application of the statute of limitations <u>de novo</u>."  <u>United States v. Gilbert</u>, 136 F.3d 1451, 1453 (11th Cir. 1998).  But we afford the district court substantial deference on the

14

remaining issue: "We review the denial of a motion for leave to conduct limited discovery under Rule 56[] for abuse of discretion." Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co., 508 F.3d 1337, 1341 (11th Cir. 2007).

### III. JURISDICTION

Germany argues that it is immune from the suit by Sovereign Bonds to enforce its Agra bonds issued by banks located in the territory that became East Germany, but we disagree. "[T]he [Foreign Sovereign Immunities Act] provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 109 S. Ct. 683, 693 (1989). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476 (1993). In World Holdings I, we held that Germany was subject to suit by World Holdings to enforce its Dawes and Young bonds under the commercial-activity exception of the Act because of "its issuance and sale of bonds in the United States." 613 F.3d at 1315. "Under the well-established prior panel precedent rule of this Circuit, the holding of the first panel to address an issue is the law of this Circuit, thereby binding all subsequent panels unless and until the first panel's holding is overruled by the Court sitting en banc or by the Supreme Court." Smith

15

v. GTE Corp., 236 F.3d 1292, 1300 n.8 (11th Cir. 2001). Based on our decision in World Holdings I, we must conclude that Germany is also subject to suit by Sovereign Bonds to enforce its Agra Bonds under the commercial-activity exception.

Our holding in World Holdings I that the issuance of the bonds falls within the commercial-activity exception to the sovereign immunity of a foreign nation controls the issue of jurisdiction over the complaint filed by Sovereign Bonds. See 613 F.3d at 1312. "[T]he holding of a case is, as the Supreme Court observed, comprised both of the result of the case and 'those portions of the opinion necessary to that result by which we are bound.'" United States v. Kaley, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) (quoting Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 66–67, 116 S. Ct. 1114, 1129 (1996)). Our decision in World Holdings I that the district court had subject matter jurisdiction under the commercial-activity exception necessarily rests on the conclusion that Germany is the continuing state of the German state that issued the bonds. See, e.g., 613 F.3d at 1312 ("Following the war, Germany affirmed its pre-war liabilities, including the Dawes and Young Bonds." (emphasis added)); id. at 1315 ("Germany concedes that its issuance and sale of bonds in the United States brings it within the commercial-activity exception to the [Act's] grant of immunity." (emphasis added)). If Germany were anything other than the continuing state of the original issuer of the bonds, we

16

would not have held that the relevant commercial activity was the issuance of the bonds. We instead would have had to examine whether Germany, as a successor state, had assumed the bond debt and, if so, whether that assumption constituted commercial activity. Cf. Mortimer, 615 F.3d at 106–113 (holding that the assumption of bond debt by West Germany constituted commercial activity). But as the continuing state that issued the bonds, Germany is liable for all of the bonds issued by Germany during the period between World War I and World War II. See Restatement Third of Foreign Relations § 208 cmt. a. ("Under international law, the capacities, rights, and duties . . . appertain to the state" and "are not affected by a mere change in the regime or in the form of government or its ideology.").

Because the Agra bonds were issued by German instrumentalities, Germany is subject to suit to enforce those bonds. The Act defines a "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). A corporation may be an instrumentality of a foreign state if the foreign state owns a majority of the corporation's shares. Id. § 1603(b)(2). The complaint filed by Sovereign Bonds alleges that the Agra bonds were issued by banks owned "in whole or in part and/or controlled by Defendant [Germany] or one of its states and/or municipalities" and that "each province was legally responsible for all obligations of its bank." Construing the complaint in the light most favorable to the plaintiff, Sovereign Bonds has adequately alleged that

17

the Agra bonds were issued in the United States by instrumentalities of Germany, and that commercial activity renders Germany subject to a suit in the United States to enforce those bonds. Insofar as the district court reached the opposite conclusion, the district court misread our precedent in World Holdings I.

Although the district court never addressed the issue, we conclude that the district court also had jurisdiction over the complaint filed by Sovereign Bonds against the German banks because those claims "are so related to claims in the action within [our] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Id. § 1367. Where, as here, each claim "involves the same facts, occurrences, witnesses, and evidence," the case or controversy requirement of section 1367 is satisfied. See Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1560 (11th Cir. 1994). Because the district court had jurisdiction over the complaint filed by Sovereign Bonds against Germany and the banks to enforce the Agra bonds, we have jurisdiction to decide this entire appeal. See 28 U.S.C. § 1291. And we vacate that portion of the order that dismissed for lack of subject matter jurisdiction the complaint filed by Sovereign Bonds to enforce its Agra bonds issued in the territory that later became part of East Germany.

18

## IV.  DISCUSSION

We divide our discussion in three parts.  First, we explain why all bonds listed in the Annex to the 1953 Validation Procedures Treaty must be validated before they may be enforced in American courts.  Second, we explain why the complaint by World Holdings with respect to its validated bonds is untimely.  Third, we explain why the district court did not abuse its discretion when it denied discovery to Sovereign Bonds to determine whether any of its bonds had been validated.

### A.  All Bonds Subject to the 1953 Validation Treaty Must Be Validated to State a Claim for Relief.

The text of the 1953 Validation Treaty unambiguously requires the validation of the Dawes, Young, municipal, and Agra bonds at issue before they can be enforced in American courts.  "The interpretation of a treaty, like the interpretation of a statute, begins with its text."  Abbott v. Abbott, __ U.S. __, 130 S. Ct. 1983, 1990 (2010) (quoting Medellín v. Texas, 552 U.S. 491, 506, 128 S. Ct. 1346, 1357 (2008)).  Because of the unique nature of treaties as agreements between sovereigns, the Supreme Court has "traditionally considered as aids to its interpretation the negotiating and drafting history (travaux préparatoires) and the postratification understanding of the contracting parties," Zicherman v. Korean Air Lines Co., 516 U.S. 217, 226, 116 S. Ct. 629, 634 (1996), but where the text is clear and "cannot be dismissed as an obvious drafting error," we must be governed

19

by the text, Chan v. Korean Air Lines, Ltd., 490 U.S. 122, 134, 109 S. Ct. 1676, 1683 (1989).  Article II of the 1953 Validation Treaty provides that "[n]o bond . . . referred to in the first sentence of Article I above shall be enforceable unless and until it shall be validated."  1953 Validation Treaty, 4 U.S.T. at 889.  Because "the first sentence of Article I" incorporates the Schedule of Bonds in the Annex to the 1953 Validation Procedures Treaty, id. at 888–89, all bonds listed in that schedule are unenforceable in American courts until validated.  The Dawes, Young, municipal, and Agra bonds are all listed in the Schedule.  See id. at 869–70, 877–78.

Sovereign Bonds argues that the 1953 Validation Treaty applies only to the Agra bonds issued by banks in the territory that became West Germany, but that argument fails.  Although the Agra bonds were issued by several different banks, some of which were located in West Germany and some of which were located in East Germany after World War II, the Annex to the 1953 Validation Procedures Treaty treats all Agra bonds as subject to validation.  The Annex provides an authoritative translation of Article 73 of the Validation Law, which states that, when a class of bond has more than one issuer, a single Examining Authority is designated as the issuer for the entire class and the location of that Examining Authority determines whether the bonds are subject to the Validation Law.  1953 Validation Procedures Treaty, 4 U.S.T. at 866.  The Examining Authority

20

designated for the Agra bonds was the Deutsche Landesbankenzentrale located in West Berlin, so all Agra bonds were treated as West German for the purpose of validation. The Validation Law did not purport to operate in East German territory, but instead created an opportunity for holders of bonds issued in territory that would become East Germany to seek payment from the government of West Germany after validation. As Germany explained, this approach prevented bondholders of the same bond issue from being treated differently solely on the basis of the location of the issuer.

World Holdings argues that the text of Article II of the 1953 Validation Treaty is ambiguous when considered in the light of the preamble of that treaty, but we disagree. World Holdings contends that the validation procedures applied only to bondholders who accepted the settlement offer of the London Debt Agreement because the preamble mentions as follows the orderly settlement of claims as the purpose for the agreement:

> WHEREAS the United States and the Federal Republic agree that further measures are required to permit debtors and creditors to proceed to the orderly settlement of the obligations arising from German dollar bonds with confidence in the stability of the procedures regarding validation and with assurance that claims prejudicial to such settlement will not be asserted on the basis of bonds which were unlawfully acquired.

1953 Validation Treaty, 4 U.S.T. at 888 (emphasis added). But the preamble can be read consistently with the text of Article II. Black's Law Dictionary defines a

21

settlement both as "[a]n agreement ending a dispute or lawsuit" and as a "[p]ayment, satisfaction, or final adjustment." Black's Law Dictionary 1496, 1497 (9th ed. 2009). Based on the latter meaning of the word, the preamble is consistent with the text of Article II that requires all bonds to be validated before they may be enforced. But even if the preamble of the treaty could not be read consistently with the text of Article II, the unambiguous text of Article II would control. Ware v. Hylton, 3 U.S. (3 Dall.) 199, 233 (1796) ("If the preamble is contradicted by the enacting clause, as to the intention of the legislature, [the enacting clause] must prevail, on the principle that the legislature changed their intention." (emphasis added)). We reject the attempt by World Holdings to introduce ambiguity where none exists.

World Holdings also argues that to require validation of bonds held by non-assenters would "render[] the right of nonacceptance under the [London Debt Agreement] . . . meaningless," but we disagree. Although the 1953 Validation Treaty imposed an additional burden on bondholders who sought to exercise their preexisting rights on the bonds, the burden was not so onerous as to force those bondholders into the London Debt Agreement. Bondholders who did not assent to the London Debt Agreement could still validate their bonds and then bring suit outside of the settlement in the hope of obtaining a greater sum.

22

The validation requirement would have fulfilled its purpose only if it applied to all bondholders. The United States and West Germany created the validation requirement to address the concern that West Germany would have to use its limited post-war resources to pay back illegitimate claims on bonds stolen by the Soviets. This concern about possible Soviet fraud is relevant both for claims made under the London Debt Agreement and for those made through separate legal procedures. It would undermine the purpose of the treaty to permit bondholders to simply "opt out" of the validation requirement.

Our decision that the validation requirement applies to all bondholders, regardless of whether they had agreed to the settlement offer in the London Debt Agreement, is consistent with the decision of the Second Circuit in a similar appeal. See Mortimer, 615 F.3d at 116–17. The Second Circuit concluded that the 1953 Validation Treaty is still in force and "a non-assenter can only enforce bonds covered by the Validation Law after complying with the validation procedures and explaining why any delay in doing so is excusable." Id. at 117. By not satisfying either criterion, World Holdings cannot enforce its unvalidated bonds and Sovereign Bonds cannot enforce its Dawes, Young, municipal, or Agra bonds.

B. *The Complaint by World Holdings to Enforce Its Validated Bonds Is Untimely.*

World Holdings also argues that the district court erred when it held that the statute of limitations barred the complaint to enforce its validated bonds, but we

23

disagree.  The complaint to enforce the validated bonds is governed by New York law.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021 (1941) (holding that federal courts apply the choice of law rules of the state in which they sit); State Farm Mut. Auto. Ins. Co. v. Roach, 945 So.2d 1160, 1163 (Fla. 2006) (explaining that Florida follows the rule of lex loci contractus and applies the law of the place where the contract was made).  In New York, "[t]he Statute of Limitations begins to run once a cause of action accrues, that is, when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court."  Aetna Life & Cas. Co. v. Nelson, 492 N.E.2d 386, 389 (N.Y. 1986) (citation omitted).  In the case of bonds, "the right to sue on the bond's principal debt does not accrue until the debt is due and payable." Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex., 660 N.E.2d 1121, 1125 (N.Y. 1995) (internal quotation marks omitted).  And the statute of limitations will "begin to run on the day after maturity of the bonds."  Id.  The parties agree that the Dawes bonds matured on October 15, 1949, and the Young bonds matured on June 1, 1965.  The parties also agree that the relevant Dawes bonds were validated by July 15, 1964, and the relevant Young bonds were validated by June 14, 1960.  And the parties agree that Germany completed its obligations under the London Debt Agreement on October 3, 2010.  Contrary to the argument of World Holdings, the dispute between the parties is not about the

24

accuracy of these dates, but about which date should be used as the accrual date for the purpose of measuring the limitations period. This dispute involves a question of law, not of fact. Because there is no genuine dispute about the relevant dates, no genuine issue of material fact barred the entry of summary judgment.

World Holdings argues that the claims on bonds held by bondholders who had refused the settlement offer in the London Debt Agreement did not accrue until October 3, 2010, when Germany completed its payment obligations to all bondholders who had accepted the terms of the London Debt Agreement, but this argument is based on a flawed understanding of the rights of bondholders who had refused the settlement offer in the London Debt Agreement. Article 10 of the London Debt Agreement prohibited West Germany from making payments on obligations owed to persons whose countries were not party to the London Debt Agreement:

> The Federal Republic of Germany will, until the discharge or extinction of all obligations under the present Agreement and the Annexes thereto, ensure that payments will not be made in respect of obligations which, while covered by paragraphs (1) and (2) of Article 4, are owed to a Government other than that of a creditor country or to any person not residing in or a national of a creditor country and which are or were payable in a non-German currency. This provision does not apply to debts arising from marketable securities payable in a creditor country.

4 U.S.T. at 450–51 (emphasis added). But Article 10 did not prohibit payments to bondholders in creditor countries like the United States. See id. at 448 (defining a

25

"creditor country" as any country other than West Germany to become party to the Agreement).  The last sentence of Article 10 instead explicitly permitted West Germany to make payments on bonds due in the United States to bondholders who had refused the settlement offer in the London Debt Agreement.  See id. (defining "marketable securities" to include bonds).  The London Debt Agreement neither prevented those bondholders from seeking payment on their validated bonds nor affected the running of the limitations period for the claims of those bondholders.

Because the London Debt Agreement did not affect the running of the statute of limitations, the complaint by World Holdings to enforce its validated bonds is untimely under either the general six-year statute of limitations, N.Y. C.P.L.R. § 213(a), or the twenty-year statute of limitations for bond-related actions, id. § 211(a).  Under New York law, a cause of action regarding a bond accrues when that bond matures.  Vigilant Ins., 660 N.E.2d at 1126.  The running of the statute of limitations is tolled until the bonds are validated, so long as the failure to timely validate the bond "was not due to [the bondholder's] own gross negligence."  1953 Validation Procedures Treaty, 4 U.S.T. at 856.  The Dawes bonds at issue matured on October 15, 1949, and were validated by July 15, 1964. The Young bonds were validated by June 14, 1960, and matured on June 1, 1965. Even under the more generous twenty-year statute of limitations, World Holdings should have filed its complaint by July 15, 1984, and June 1, 1985, respectively.

26

World Holdings did not file its complaint until January 23, 2008, more than twenty years too late.

### C. *The District Court Did Not Abuse Its Discretion When It Denied Validation Discovery.*

The district court did not abuse its discretion when it declined to grant Sovereign Bonds discovery to determine if any of its Dawes, Young, municipal, or Agra bonds were validated. Rule 56(d) provides for some limited discovery to assist a nonmovant to oppose a motion for summary judgment. Fed. R. Civ. P. 56(d). But "[f]acial challenges to the legal sufficiency of a claim or defense, such as a motion to dismiss based on failure to state a claim for relief, should . . . be resolved before discovery begins." Chudasama v. Mazda Motor Corp., 123 F.3d 1353, 1367 (11th Cir. 1997). Because a facial challenge to the legal sufficiency of a claim raises only questions of law, "neither the parties nor the court have any need for discovery before the court rules on the motion." Id. We have suggested that a failure to rule on such a motion would in itself be an abuse of discretion. See Cotton v. Mass. Mut. Life. Ins. Co., 402 F.3d 1267, 1292 (11th Cir. 2005). As the district court explained, "Sovereign is seeking to change the logical sequence of litigation." In the light of our precedents, the district court acted well within its discretion to deny the request of Sovereign Bonds for discovery.

## V.  CONCLUSION

We **AFFIRM** the summary judgment in favor of Germany against World Holdings, **VACATE** that portion of the order that dismissed for lack of subject matter jurisdiction the complaint filed by Sovereign Bonds to enforce its Agra Bonds issued in the territory that later became East Germany, and **AFFIRM** the dismissal with prejudice of both complaints filed by Sovereign Bonds.